**UNITED STATES of America,
Plaintiff,**

v.

**HOYTS CINEMAS CORP., and
National Amusements,
Inc., Defendants.**

**No. CIV.A. 00–12567–WGY.**

United States District Court,
D. Massachusetts.

March 31, 2003.

Michael J. Pineault, Eugenia M. Carris, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA, for Plaintiff.

John T. Haggerty, Law Offices of John T. Haggerty, Charlestown, MA, Michael J. Malone, Paul Straus, Deborah S. Burstein, Leslie J. Arnold, Patricia A. Griffin, R. Colby Allsbrook, King & Spalding, New York, NY, James R. Carroll, David S. Clancy, Skadden, Arps, Slate, Meagher & Flom, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

This case concerns stadium-style movie theaters and the seating to which wheelchair-bound people have access. The Government has brought suit against two major movie theater chains, charging that certain of their movie theaters deny wheelchair-bound people access to stadium-style seats.

Specifically, the Government has brought suit under 42 U.S.C. § 12188(b)(1)(B) against National Amusements, Inc. ("National Amusements") and Hoyts Cinemas Corporation ("Hoyts"), (collectively "the Cinemas"), alleging that the Cinemas are in violation of Title III of the Americans With Disabilities Act (the "ADA"), 42 U.S.C. §§ 12181–12189. Compl. ¶ 1 [Docket No. 1].[1] The Government alleges that the Cinemas constructed and now operate stadium-style theaters that deny persons who use wheelchairs equal access to the stadium section. *Id.* ¶ 2–3. National Amusements and Hoyts are both Massachusetts corporations. Hoyts' Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Hoyts' Statement") [Docket No. 114] ¶ 1.; National Amusements' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("National Amusements' 56.1 Statement") [Docket No. 105] ¶ 1. Since 1997, National Amusements has designed, constructed, and operated thirty-two stadium-style motion picture complexes in the United States, at least six of which are located in Massachusetts. Government's Affirmative Statement of Relevant Facts ("Gov't.'s Affirmative Statement") [Docket No. 128], ¶¶ 66, 69; National Amusements' 56.1 Statement ¶ 4. During this same period, Hoyts has designed, constructed and now operates over twenty-five stadium-style motion picture complexes in the United States, at least three of which are located in Massachusetts. Compl. ¶¶ 2, 10; Hoyts' State-

1. The Government originally brought two separate civil actions. One was against Hoyts Cinemas Corporation, No. Civ.A.00–12567–WGY and the other was against National Amusements Inc., No. Civ.A.00–12568–WGY. This Court consolidated the actions. The two Complaints are virtually identical; therefore, the Court refers to Hoyts' Complaint simply as "Complaint" and uses this Complaint generally when referring to the Complaint in the case at bar. The Court refers to National Amusements' Complaint as "National Amusements' Complaint" only when necessary.

ment ¶ 16. Although not all of the theaters involved are specifically referenced in the Government's Complaint, over 500 individual movie theaters—sometimes referred to as auditoriums—are at issue in this litigation (National Amusements—approximately 284; Hoyts—approximately 223). Gov't.'s Affirmative Statement ¶ 78–79, 119; National Amusements' 56.1 Statement ¶ 4; Hoyts' Statement ¶ 16.

## I. Background

### A. Procedural History

The Government originally brought a suit against Hoyts, No. Civ.A. 00–12567–WGY and a suit against National Amusements, No. Civ.A.00–12568–WGY. The two complaints were almost identical in substance. On June 13, 2001 this Court consolidated the two separate civil actions under docket number Civ.A.00–12567–WGY, which named both parties as co-defendants. The Complaint set forth two counts, one of which (Count II) this Court dismissed on August 22, 2001. *United States v. National Amusements, Inc.,* 180 F.Supp.2d 251, 262 (D.Mass.2001). The remaining Count (Count I) alleges that the Cinemas has violated section 303(a)(1) of the ADA, 42 U.S.C. § 12183(a)(1), and its implementing regulation, (including section 4.33.3 of the ADA Accessibility Guidelines) by failing to design and construct stadium-style movie theaters that are readily accessible to, and usable by, individuals with disabilities requiring them to use wheelchairs. Compl. ¶ 20. The Government has asked this Court for declaratory, injunctive, and remedial relief and to assess a civil penalty against Cinemas. National Amusements' Compl. ¶ A–F. With regard to injunctive relief, the Government seeks it both retroactively and prospectively. *Id.* ¶ C–D. In June of 2002, the Cinemas moved for summary judgment. *See* National Amusements' Motion and Memoran-

dum in Support, [Docket Nos. 103 & 104], and Hoyts' Motion and Memorandum in Support, [Docket Nos. 112 & 113]. On September 12, 2002, the Court heard oral argument on the Cinemas' motion.

### B. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure mandates entry of summary judgment against a party who fails to demonstrate a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The entry of summary judgment can only be avoided if the facts in dispute are "material," that is, the dispute must be "over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant, however, is not required to make an affirmative showing that there are no material facts in issue. *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Instead, the movant only has to show an "absence of evidence to support the non-moving party's case." *Id.* Furthermore, "[o]n issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir. 1991).

### C. Statutory Framework: The ADA and Section 4.33.3

#### 1. *The Americans With Disabilities Act*

The ADA was passed on July 26, 1990. Congress promulgated the ADA based upon factual findings that the disabled suffered from discrimination, isolation, segregation, and lack of physical access to certain services and facilities. 42 U.S.C. § 12101(a)(1)-(3),(5). Congress found that the disabled were often politically power-

less and were left without legal recourse to remedy discrimination against them. 42 U.S.C. § 12101(a)(4), (7). Congress also found that discrimination against the disabled left them "severely disadvantaged socially, vocationally, economically, and educationally," and denied them the opportunity to achieve independent living and economic self-sufficiency. 42 U.S.C. § 12101(a)(6), (8), (9).

Title III of the ADA, 42 U.S.C. §§ 12181–12183, prohibits discrimination against the disabled by public accommodations. The ADA defines "public accommodations" to include privately-owned commercial entities such as movie theaters. 42 U.S.C. § 12181(2), (7)(C). Section 302 of the ADA generally provides that no place of public accommodation may discriminate against an individual based on their disability:

No individual shall be discriminated against on the basis of disability in the *full and equal enjoyment* of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a) (emphasis added). Section 302 also prohibits places of public accommodation from denying disabled individuals the opportunity to *"participate in or benefit from* the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i) (emphasis added). In addition, the ADA defines discrimination against the disabled to include circum-

stances in which an entity enables handicapped individuals "to participate in or benefit from a good, service, privilege, advantage, or accommodation that is not equal to that afforded to other individuals", 42 U.S.C. § 12182(b)(1)(A)(ii), and when an entity provides disabled persons "with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual ... [an] opportunity that is as effective as that provided to others." 42 U.S.C. § 12182(b)(1)(A)(iii). Finally, Section 302 mandates that settings for individuals with a disability be integrated as much as possible: "Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the *most integrated setting appropriate to the needs of the individual."* 42 U.S.C. § 12182(b)(1)(B) (emphasis added).

The Government has alleged, and it is not disputed, that the Cinemas have designed and constructed movie theaters for first occupancy since 1997—well over thirty months after the passage of the ADA (July 26, 1990).[2] Compl. ¶ 2. As such, the movie theaters in this case are governed by Section 303(a), which regulates the construction of "new" facilities as opposed to existing buildings,[3] and defines discrimination as:

[A] failure to design and construct facilities for first occupancy *later than 30 months after* July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where

---

**2.** Title III of the ADA was passed on July 26, 1990 but made effective on January 26, 1992. 56 Fed.Reg. 35.408 (July 26, 1991) (statutory background). The ADA uses July 26, 1990 as the date upon which the thirty-month grace period begins. 42 U.S.C. § 12183(a)(1). Even if the Court were to use the date that Title III of the ADA became effective, Cinemas

designed and constructed these theaters over thirty months succeeding that date as well.

**3.** Interestingly, in *existing* buildings, wheelchair-accessible seats *are required* to be *"dispersed* throughout the seating area."* 28 C.F.R. § 36.308(a)(ii)(A).

an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.

42 U.S.C. § 12183(a)(1) (emphasis added).

To help implement the ADA correctly, the Attorney General was instructed to issue regulations to carry out its provisions no later than one year after its enactment. *Id.* 42 U.S.C. § 12186(b). The Architectural and Transportation Barriers Compliance Board, ("the Access Board"), was also instructed to issue minimum guidelines to supplement the ADA within nine months of the ADA's passage. 42 U.S.C. § 12204(a). The Attorney General's regulations must be consistent with the Access Board's minimum guidelines and requirements. 42 U.S.C. § 12186(c).

Pursuant to sections 306 and 504 of the ADA, the Attorney General and the Access Board—after a period of notice and comment—issued regulations and guidelines for assembly seating facilities such as movie theaters (as well as concert halls and sporting arenas). These final ADA Accessibility Guidelines for Building and Facilities ("Accessibility Guidelines") were issued on July 26, 1991. 56 Fed.Reg. 35408 (July 26, 1991). The Attorney General provided notice and comment for its proposed regulations and promulgated its final Title III regulations on July 26, 1991 as well. 28 C.F.R., pt. 36, App. B. He adopted the Access Board's Accessibility Guidelines (in their entirety) into his final regulations as the Attorney General's "Standards for Accessible Design." 28 C.F.R. pt. 36, App. A. The Attorney General's regulations specifically provide that any new construction must comply with the Access Board's Accessibility Guidelines. 28 C.F.R. § 36.406.

**2.** *Section 4.33.3*

This brings us to the heart of this case. The specific Accessibility Guidelines regulation that is the focal point for this litigation is Section 4.33.3, which reads as follows:

*Wheelchair areas shall be an integral part of any fixed seating plan* and shall be provided so as to provide people with physical disabilities a choice of admission prices and *lines of sight comparable to those for members of the general public.* They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. *When the capacity exceeds 300, wheelchair spaces shall be provided in more than one location.* Readily removable seats may be installed in wheelchair spaces where the spaces are not required to accommodate wheelchair users.

EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

28 C.F.R. pt. 36, App. A, § 4.33.3 (emphasis added) ("Section 4.33.3"). Section 4.33.3 applies not just to movie theaters but also to concert halls and sporting arenas. Unlike the clear requirement that handicapped seating be *dispersed throughout* the seating area in *existing* buildings, *see supra* note 3, Section 4.33.3 appears to allow clustering of these seats, except in large theaters.

**D. A Factual Overview**

**1.** *Stadium–Style Seating*

As a preliminary matter, the Court notes that "Wheelchair accessible seats"

are not actual seats but an empty space in which a wheelchair can fit between the seats permanently affixed to the floor. When a wheelchair seating space is not being used, a removable seat may be placed in the area to accommodate a person who is not wheelchair-bound.

By way of introduction to stadium-style movie theaters (allowing for individual differences from theater to theater), the Court gleans the following—as a *general matter*—from the record of undisputed facts. Stadium-style seating in movie theaters was invented in 1995 and came into widespread use more recently. The majority of stadium-style movie theaters, including those involved in this case, are designed so that the stadium-style seating section is in the middle and back part of the theater, while the "traditional-style" seating in the front. The two sections are generally separated by an access-aisle that most patrons necessarily use upon entering the theater to access their seats. Stadium-style theaters, therefore, comprise two distinct types of seating: stadium seating and traditional seating. Not only are the sections separate, but the stadium-style section is usually accessible by stair and, thus, cannot be reached by wheelchair. Even if a well-meaning group of friends were to carry their companion's wheelchair up these stairs, because the stadium-style seats are generally not removable, there would be no room in which to place the wheelchair.

It is an undisputed fact that the *majority* of seats in a stadium-style theater (including those stadium-style theaters involved in this case) are in the stadium section. Generally, although it differs by degree, the percentage of stadium-style seats in a stadium-style theater is approximately seventy percent or more.

In a stadium-style theater, each row of stadium seats is located on a riser that is elevated approximately twelve to eighteen inches higher than the riser immediately preceding it. Traditional seats are located in the front of auditoriums—much closer to the screen—on a flat and gradually-sloped floor. *Sometimes*, these seats are also on risers, but generally the rise is approximately three to ten inches and does not provide the same marked contrast between rows as do the stadium-section risers.[4] Stadium-seating is so named because such a pronounced differentiation in elevation from row to row creates the effect of a viewing angle similar to that found when sitting in a tiered sports stadium. A viewer in the stadium section—being so elevated above the person in front of her—need not worry about the age-old and somewhat comic problem of having her view blocked by a taller person (with a strange hat). Each row is, in this sense, an island unto itself. In addition, the stadium-style tiered design provides a more expansive view of the screen. The viewer looks more directly at the screen from a flatter angle and is not forced to look upwards (as is the case in traditional theaters).

Because of the stadium section's elevation, the movie screen can be widened and, in virtually all stadium-style theaters, the screen is correspondingly larger than that in a traditional theater. A consequence of the larger screen, however, is that the closer a viewer is to the front of the the-

---

4. The Government frequently refers to the traditional seating section in the Cinemas' movie theaters as "the flats," but this is not entirely correct. Often the traditional seats are on risers themselves, and if not, they are on a sloped floor. For this reason, the Court refers to the front section of the theater, where there are no stadium-style seats, as the "traditional" seating section. All stadium-style movie theaters have a traditional seating section.

ater in the traditional seating section of the stadium-style theater, the harder it is to view the entire screen. To compensate—again as a general matter—the space between the first row of seats in a given stadium-style theater, (which are *always* traditional seats) are further back from the screen than in a conventional theater that is wholly comprised of traditional seating sections. Given the larger width of the screen, this is perfectly understandable.

Stadium-seats have other pronounced advantages over the thin and small-backed seats usually found in movie theaters. Usually, the seats tilt backward at varying angles. They are wider and have much longer seat-backs that extend to the top of the average patron's head, further enhancing the comfort of the movie-going experience. Moreover, virtually all stadium-style seats are equipped with wider arm-rests that reduce the crowding between patrons seated in the same row. These arm-rests come complete with large cup-holders for refreshments.[5]

In short, stadium-seating provides a markedly superior view and experience to traditional seating in traditional theaters. Were this not the case, the movie theater industry would not be so aggressively marketing stadium seating as a better movie-going experience for the viewer.[6] To that end, it is clear that, even within the stadi-um-theaters themselves, there is a marked difference between the view from the stadium-style section and the view from the separate, traditional section.

2. *The Layout of the Cinemas' Theaters*

Without digressing into intricate detail, the *majority* of wheelchair-accessible seats in the stadium-style movie theaters that are at issue in this case are located in the traditional-style seating sections. A rough outline of wheelchair-accessible seating according to the seating plans of the Cinemas' movie theaters is as follows. The Cinemas almost always—though not exclusively—locate some wheelchair-accessible seating in the traditional seating section. In a minority of instances, this is the *only* section in which wheelchair-accessible seating is located, and, on rare occasions, the wheelchair-accessible seating is positioned *only* in the *front* rows of the traditional section. Most often, however, the Cinemas locate wheelchair-accessible seats both in the traditional section, and then also immediately in front of the stadium section on the access-aisle that separates the two sections. Occasionally, wheelchair accessible seating is located only on the access-aisle immediately in front of the stadium section and nowhere else in the theater. In some instances, on the other hand, larger theaters provide wheelchair-

---

5. A person in a wheelchair is generally expected to remain in that wheelchair while part of a film audience. Theater owners assume such persons prefer to move independently without assistance, seek to avoid the difficulty of switching seats, and wish to retain the ability to leave quickly in the case of an emergency (or otherwise). Accordingly, the advantages described in the above paragraph do not apply to the wheelchair-bound patron. The Court mentions the advantages of stadium-style seats here simply to note the stark contrast between stadium and traditional seating.

6. National Amusements has stated in press releases touting its new stadium theaters that stadium-style seating is "one of the greatest advances in moviegoing in years" and that it "optimizes sight lines to the screen" and makes "every seat" the "best in the house". Gov't.'s Affirmative Statement ¶ 67. Hoyts has issued similar press releases extolling the virtues of stadium seating. According to Hoyts, stadium-style seating "[e]nsures moviegoers the ultimate cinematic experience" and guarantees all patrons "the best seat in the house" because "[g]one are the days of craning your neck to see the screen." *Id.* ¶ 68.

accessible seats in all three areas: the traditional section, the access-aisle, and in the very back rows of the movie theater. Although it is possible to place wheelchair-accessible seating in the stadium section, it is extremely rare. This Court has found only two examples in the voluminous record in which the Cinemas have placed wheelchair-accessible seats *among* the stadium section, as well as in traditional seating.

The individual theaters that the Government contends violate the ADA in this case are not monolithic in their design. There are differences from theater to theater, but the above sketch holds true as a general proposition, regarding stadium-style seating technology and the location of wheelchair-accessible seating in the theaters at issue.

A more specific outline of the Cinemas' theaters seating-plans reveals that none of National Amusements' theaters have wheelchair-accessible seats in the first two rows of the traditional section (the front rows closest to the screen), but that thirty-eight of the Hoyts' movie theaters locate them in the first row and forty-four locate them in the second row. Gov't.'s Affirmative Statement ¶ 119(c). Hoyts has gradually modified its theaters so that wheelchair-seating has been moved from the front row of the traditional seating section to the back of it. Hoyts' Statement ¶¶ 5. In February of 1998, Hoyts issued a guideline for new construction, partly in response to threatened lawsuits, directing that wheelchair-accessible seating should *never* be placed in the first row of any theater. Gov't.'s Affirmative Statement ¶ 102. In both Hoyts and National Amusements' theaters, wheelchair-accessible seating is sometimes located only on the access-aisle immediately in front of the stadium section, as is shown by examples submitted by both parties. *See* Ex. C to Gov't.'s Consolidated Opp'n to Defs.' Mot.

for Summ. J. [Docket No. 127] ("Gov't.'s Consolidated Opp'n"), National Amusements' Auditorium 1 in Randolph, MA.; Figure N–25 of Greenburgh, N.Y. Auditoriums 1 and 10, submitted by Hoyts at September 12, 2002 Oral Argument. In 279 of the Cinemas' theaters, the most common design is to place the wheelchair-accessible seating in a completely separated traditional seating section in front of the stadium section. *See* Gov't.'s Suppl. Subm. in Opp'n to Defs.' Mot. for Summ. J. ("Gov't.'s Supplemental Br.") [Docket No. 158] at 1–2 and Tabs 1–4. Even if the traditional seating areas is on "risers," the wheelchair accessible seats range from four and one-half feet to twelve inches lower than even the very first row of the stadium section and are much closer to the screen. Gov't.'s Affirmative Statement ¶¶ 78–79.

Forty-one of Hoyts' movie theaters have a capacity of 300 or more and fifty-two of National Amusements' movie theaters have the same. Gov't.'s Affirmative Statement ¶¶ 78–79 In these movie theaters of 300 capacity or more, wheelchair-accessible seating may be found, among other places, in the very back row of the theater, accessible by an elevator with a separate exit to the mezzanine. *Id.*

The Court has come across only two theaters (located in Warwick, Rhode Island) in which wheelchair-accessible seating is found *among* stadium-style seats. Gov't.'s Corrected Attachments to Consolidated Opp'n ("Gov't.'s Corrected Attachments") [Docket No. 140], Attachment D. There, in addition to being on the access-aisle, it is located five rows into the stadium section. *Id.*

3. *Factual Conclusions from Undisputed Evidence, Judicial Notice, and a Reasonable Inference*

Although attempting to synthesize each of the respective designs and floor-plans of

all the different individual movie theaters involved in this litigation is difficult, two aspects of this case are clear following an inspection of the vast record before the Court. First, despite many variations, most of the wheelchair accessible seating is located in the traditional seating section. Second, given the inherent superiority of the view afforded by the seats in the stadium-style section as opposed to that provided by those in the more traditional seating sections, their physical locations, and other characteristics, the best seats in all of these theaters reside in the stadium section. The stadium section contains the most desirable seats, and wheelchair-accessible seating, on the whole, is generally not part of this section.

Seat selection plays a part in this analysis. Even in a wholly traditional theater, as anyone who has ever been to the movies knows, patrons typically tend to avoid the front rows of a theater until all the middle and back rows are filled, and most audiences initially congregate in the middle seats.[7] The Government has offered to present evidence of this tendency to the Court by submitting an expert's report (the Cremieux Report [Docket No. 136]) and a "study" consisting of videotapes of theater-going audiences choosing their seats. This is unnecessary. Pursuant to Fed.R.Evid. 201, the Court takes judicial notice of the tendency of movie theater patrons first to sit in the middle or towards the back of the theater. Naturally, because of their basic location and superiority, patrons entering a stadium-style theater will choose the seats in the stadium section and will only go to the traditional seats in the front of the theater when this is made necessary because the stadium section is full. The Court accepts this eminently reasonable inference as an obvious and incontestable fact.

## E. The Government's Allegations and The Cinemas' Response

Count I of the Complaint alleges that the Cinemas are violating Section 303 of the ADA because they have failed to comply with Section 4.33.3 on the following two grounds:

[1] People with physical disabilities who use wheelchairs are not provided *lines of sight comparable to those for members of the general public;* and/or

[2] In the majority of the stadium-style theaters, the wheelchair areas are not an *integral part of the fixed stadium-style seating plan.*

Compl. ¶ 20 (emphasis added). In terms of the language of 4.33.3, the Government's two-pronged argument rests on "lines of sight comparable to those for members for the general public" in its first prong and "integral part of any fixed seating plan" in its second. 28 C.F.R. pt. 36, App. A, § 4.33.3 Supporting the first prong, the Government has submitted, among other reports, a four-volume architectural report by Robert Luchetti Associates ("the Luchetti Report") [Docket No. 137] to help provide a proper standard for evaluating whether the "viewing angle" of a certain seat complies with Section 4.33.3's comparable "lines of sight" requirements. Gov't.'s Consolidated Opp'n at 7. Regarding the second prong of its Complaint, the Government argues that Section 4.33.3 dictates as matter of law that wheelchair-accessible seating must be an integral part of the *stadium section* of the theater.

The Government submits that the Cinemas have built their stadium-style theaters in such a way that the vast majority of disabled patrons who use wheelchairs *must* sit in the front rows of the traditional seating section and have no access to the

---

7. Except for a few kids whose motives are, at this remove, obscure.

superior stadium-style seats. Gov't.'s Consolidated Opp'n at 1. The Government contends that this violates the ADA because it banishes handicapped patrons to the worst seats in the theater, which are closest to the screen and, therefore, provides wheelchair-bound theater patrons with the poorest viewing angles. *Id.* at 2–3, 8. Those in wheelchairs have no "choice." They have to sit in the front of the theater where "most people choose not to sit," and cannot sit in the stadium section *even if* there are a large number of stadium seats that are empty. *Id.* at 20.

The Cinemas, in turn, argue that all of their theaters comply with Section 4.33.3 as matter of law. Hoyts' Mem. in Support of Mot. for Summ. J. ("Hoyts' Mem.") [Docket No. 113] at 2–13 They point out that four other United States district courts—wrestling with the question of Section 4.33.3's meaning—have ruled that wheelchair seats must only have unobstructed views to the screen and must be located *among* general public seating, that is, anywhere in the theater. *Id.* at 5–8.

The Cinemas further argue that acceptance of the Government's reading of Section 4.33.3 would, in effect, replace a reasonable standard with an "absurdly demanding" one. National Amusements' Mem. in Support of Mot. for Summ. J. ("National Amusements' Mem.") [Docket No. 104] at 12; *see also id.* at 10, 14. The Cinemas argue that the Government is attempting to use the comparable "lines of sight" requirement of Section 4.33.3 to require that wheelchair accessible seating provide a *better* viewing angle than most seats in the theater, including many in the stadium section. *Id.* at 10–14. In fact, the Cinemas contend, the test that the Government recommends for the determination of what constitutes an acceptable viewing angle and, thereby, the proper "line of sight" to the screen,

would render *all* of the seats in certain of the Cinemas' theaters violative of Section 4.33.3—even the seats in the stadium section—thus providing an untenable standard. National Amusements' 56.1 Statement ¶ 20; *see also* Hoyts' Mem. at 10 ("The vast majority of *all seats* in *all stadium style theaters throughout the United States* fail Mr. Luchetti's four-pronged test."). The Cinemas submit that the "Luchetti Standard," as articulated in the Luchetti Report, and the Government's reading of 4.33.3 are far too complicated and demanding to use in evaluating viewing angles because they automatically implicate too many seats. *See* National Amusements' Mem. at 12–13.

The Cinemas strenuously argue that the Government's proposed interpretation of Section 4.33.3 for the purposes of this litigation, especially the Luchetti Report, must be rejected solely because use of this standard is "tantamount to creating a new substantive rule." Hoyts' Mem. at 10; National Amusements' Mem. at 13. Essentially, the Cinemas argue that the Government is attempting to fashion a new rule by stretching its interpretation of current ADA regulations beyond recognition. Hoyts' Mem. at 11–12. The proper way to do this, say the Cinemas, is to change the regulations, rather than complain to this Court. National Amusements' Supplemental Submission in Support of Motion for Summ. J. ("National Amusements' Supplemental Br.") [Docket 160] at 14. The Cinemas accuse the Government of attempting to achieve judicial legislation, rather than working from within to rewrite their own rules to meet the demands of a new technological innovation. National Amusements' Mem. at 2; 9/12/02 Motion Hrg. Tr. at 18, 11. 9–25.

The Cinemas submit that because the wheelchair seating spaces are located with-

in the general seating area (even if most are close to the front of the theater) and provide an unobstructed view of the screen, they are in compliance with the ADA under existing law. National Amusements' Mem. at 5–9; Hoyts' Mem. at 5–7. In short, the Cinemas argue that if wheelchair seating is *among* the seats available to the general public, such seating *is* an integral part of the seating plan and *necessarily* offers lines of sight "comparable" to those of the general public. Hoyts' Mem. at 14–15; National Amusements' Mem. at 20. While the wheelchair areas may indeed be separate from the other seating areas (for example in access-aisles) the Cinemas submit that this is partly due to safety ordinances, fire codes, and section 4.33.3 itself, all of which that require egress from the theater for all patrons and for those in wheelchairs. *See e.g.,* Hoyts' Statement ¶¶ 3, 40–42.

Lastly, the Cinemas argue that the injunction prayed for here cannot be granted against them because the Government has not shown and cannot show that the potential remedies are feasible. Hoyts' Mem. at 18. The Cinemas point out that Hoyts simply asked the Court to order Cinemas to comply with the statute, and therefore did not describe the injunction with the detail required under rule 65(d) of the Federal Rules of Civil Procedure. *Id.* This vagueness, they argue, enables the Government to, in effect, "bifurcate" this proceeding by having the Court first deal with liability and then later fashion a remedy *after* Section 4.33.3 is found to be violated. *Id.* The Cinemas claim this should not be allowed because the Government did not specifically move for bifurcation at the outset of the case. *Id.*

## F. Oral Argument

This Court heard oral argument on the Cinemas' motion for summary judgment on September 12, 2002. During this motion session, the Court made it clear—for reasons that will be shown below—that it had "real problems" with the comparable "lines of sight" prong of the Government's argument in Count I. 9/12/02 Motion Hrg. Tr. at 8, ll. 1–13.; *Id.* at 7, ll. 18–25. The Court said, however, that it tentatively believed that theaters that did not provide wheelchair-accessible seats in the stadium section did not meet the "integral" requirement of 4.33.3. *Id.* at 7, ll. 7–9. The Court also indicated that requiring the Cinemas to retrofit their theaters to comply with the integral requirement of 4.33.3 would offend the basic principles of injunctive relief and due process, because, among other things, the regulation at issue was written well before stadium-style seating was even invented. *Id.* at 10–12. For this reason, the Court indicated that it might only provide prospective relief to future stadium-style theater construction, if it ruled in the Government's favor. *Id.* at 12, ll. 8–14. The Court cautioned, however, that this was not necessarily how the Court would rule, and explained that it was simply providing this insight to "give Counsel something to argue against" and "make oral argument more pointed." *Id.* at 12, ll. 15–17. It repeated this warning at the end of the hearing. *Id.* at 20–21 ("No one should take any comfort or be caused any concern by my being forthcoming about possible arguments."). The Court took the matter under advisement and invited further briefing on these issues and supplemental submissions to the factual record. *Id.* at 21, ll. 11–17.

The following opinion outlines the Court's reasoning and holdings now that all parties have had ample opportunity to provide supplemental briefs and submissions and the Court has had time for further reflection on the issues in this case.

## II. DISCUSSION

Interpreting Section 4.33.3 is the central issue. Compliance with Section 4.33.3 is *per se* compliance with the ADA. *National Amusements,* 180 F.Supp.2d. at 257–58, 261–62 (noting Congress' "intent *at all times* to have regulations set forth standards that if met would satisfy Title III obligations with respect to the design of a structure"). Therefore, a violation of Section 4.33.3 is the only ground advanced by the Government as a basis for liability for violating the ADA.

### A. Existing Decisional Law

Five other courts have grappled with Section 4.33.3.'s meaning. None of these decisions were made by the First Circuit and, therefore, none are binding on this Court. They do, however, help frame the issues. Broadly stated, three cases go the Cinemas' way, one is a tie, and one—the most recent—adopts the Government's point of view.

The Cinemas rely on *Lara v. Cinemark U.S.A., Inc.,* 207 F.3d 783 (5th Cir.2000), and the two cases that follow it: *Oregon Paralyzed Veterans of America v. Regal Cinemas, Inc.,* 142 F.Supp.2d 1293 (D.Or. 2001) and *United States v. Cinemark U.S.A., Inc.,* Case No. CIV.A.99–705, slip op. (N.D.Ohio Nov. 19, 2001) ("the *Lara* cases"). *See* National Amusements' Mem. at 6; Hoyts' Mem. at 5–7. The Cinemas also rely on a case decided on August 14, 2002 in the Northern District of New York: *Meineker v. Hoyts Cinemas Corp.,* 216 F.Supp.2d 14 (N.D.N.Y.2002).

The *Lara* cases concentrate on the comparable "lines of sight" language of 4.33.3, ruling that the term "lines of sight comparable" does *not* impose a "viewing angle" because there was no "specific regulatory guidance" on the issue. *Lara,* 207 F.3d at 788–89; *Oregon Paralyzed Veterans,* 142 F.Supp.2d at 1296–98 (noting also that stadium-style theaters were not constructed until four years after Section 4.33.3 was adopted). These cases conclude that Section 4.33.3 requires only that wheelchair-seating be situated *among* the general seating area and offer lines of sight that do not suffer from any obstructions. *Lara,* 207 F.3d at 789; *Oregon Paralyzed Veterans,* 142 F.Supp.2d. at 1297–98.

The Government argues that *Lara* and its progeny were wrongly decided because the *Lara* court: (1) decided the case without any support in the regulation's language for the interpretation and, therefore, was incorrect in ruling that "lines of sight" meant only an "unobstructed view;" (2) relied on a history that only looked at Technical Assistance Manuals written before stadium seating had been invented; (3) did not grant deference to the agency's interpretation of its own regulations; and (4) selectively quoted proposed regulations to bolster its holding and ignored sections that took viewing angles into account when assessing whether a line of sight is comparable.[8] *See* Gov't.'s Consolidated Opp'n at 13–16.

This Court rules that *Lara* and its progeny are flawed for these very reasons,

---

**8.** The language the *Lara* court omitted from this proposed regulation could hardly be more clear:

[a]s stadium-style theaters are currently designed, patrons using wheelchair spaces are *often relegated* to a few rows of each auditorium, *in the traditional sloped floor area* near the screen. Due to the size and proximity of the screen, as well as other factors related to stadium-style design, patrons using wheelchair spaces are required to tilt their heads back at uncomfortable angles and to constantly move their heads from side to side to view the screen. They are afforded inferior lines of sight to the screen. 64 Fed.Reg. 62277 (November 16, 1999) (emphasis added).

especially because *Lara* inexplicably decided that lines of sight need only be unobstructed to comply with Section 4.33.3, despite the language in the regulation that unequivocally requires the lines of sight to be comparable to those available to the general public.

This Court agrees with the Government's reasons for questioning the *Lara* line of cases' interpretation of the phrase "lines of sight comparable." The Court follows *Meineker*, however, in its assessment of what the phrase means in practice, as well as its deduction that Section 4.33.3 pertains to stadium-style theater construction and the acceptable location for wheelchair-accessible seating. *Meineker*, 216 F.Supp.2d at 18.

*Meineker* is the case that ends in a "tie," so to speak. An important *caveat* to the holdings of *Lara* and its progeny is found in *Meineker*, which states that the sight line offered to wheelchair-using patrons must be "similar" and not merely "similarly unobstructed." *Meineker*, 216 F.Supp.2d at 18. In short, an unblocked view of the screen is not enough to satisfy the ADA according to *Meineker*. Section 4.33.3 is a comparative standard; therefore, the quality of the sight line matters. *Id.*

In *Meineker*, the theaters with capacity of 300 seats or fewer that located wheelchair-accessible seating among the floor seating at the rear of the traditional floor section and "as close to the center of the theater as possible" were held to be in accordance with 4.33.3.[9] *Meineker*, 216 F.Supp.2d at 18. The *Meineker* court

made clear in a footnote that, had the seating remained in the very first row of the theater, "the absolute worst seats," it could not have offered a line of sight comparable to a significant number of seats available to the general public and would have violated the ADA. *Id.* According to *Meineker*, then, some wheelchair-accessible seats do not provide "lines of sight comparable to those for members of the general public" and are unacceptable under 4.33.3., for example, seats located in the very front row of stadium-style theater in the traditional section.

Pursuant to the reasoning and holding in *Meineker*, a case cited by the Cinemas throughout their submissions to this Court, thirty-eight of the Hoyts cinemas in this case violate the ADA because they locate the wheelchair seating only in the very front row of the theater. Thus, *Meineker*, while cited by the Cinemas, actually argues much more strongly in favor of the Government's position concerning "lines of sight."

In terms of the "integral" requirement of 4.33.4., however, *Meineker* supports the Cinemas' position. *Meineker* held that the "integral" requirement of 4.33.3 was not violated by the theaters at issue because the exception in Section 4.33.3 allows clustering of wheelchair-accessible seating in areas such as balconies. *Id.* at 18. The *Meineker* court ruled that this exception made clear that wheelchair-accessible seating need not be scattered throughout the theater, and, therefore, it held that "wheelchair seating is an 'integral' part of the fixed seating plan [for the purposes of Section 4.33.3] because such seating is in-

---

9. Originally, the wheelchair-accessible seats in the fourteen theaters with seating capacity 300 or fewer were located in the "most undesirable part of the theaters ... directly beneath the screen at the very front of the theaters." *Meineker*, 216 F.Supp.2d at 15. In the four theaters that had a capacity of more than 300, wheelchair seating was located in "several locations both on the flat floor and at the back of the stadium-style seats." *Id.* The seats were not relocated in these four theaters and the court held them to be in compliance with 4.33.3. *Id.* at 18.

corporated into, and located among, the seating for the general public." *Id.* at 19.[10]

*Meineker*'s cursory dismissal of the issue of the "integral" requirement of Section 4.33.3 is, however, somewhat impenetrable. It is true that Section 4.33.3's exception allows for clustering in "bleachers and balconies, and other areas having sight lines that require slopes of greater than five percent," but this applies to bleachers and balconies *and the like,* and not to the traditional seating section, which is none of these. 28 C.F.R. pt. 36, App. A, § 4.33.3. Certainly, Section 4.33.3's provision movie theaters with a capacity of greater than 300 must put wheelchair-accessible seats in "more than one location" can be viewed as indicating that *all* wheelchair-accessible seats in theaters with a capacity of under 300 *may* be put in the same place. *Id.* This does not resolve, however, whether the *one place* wheelchair-accessible seating may be put can be considered an "integral" part of the fixed seating plan if this one place is segregated from the stadium section. Hence, this Court does not follow the *Meineker* court's decision as it relates to the "integral" requirement. While it is true that all wheelchair-accessible seats *may* be put in the same place and clustered, as will be seen, this Court rules that this "same place" must be in the stadium section to satisfy Section 4.33.3 and the ADA.

The case most recently deciding the "lines of sight" issue went the Government's way. In *United States v. AMC Entertainment, Inc.,* the Court gave deference to the agency's "reasonable interpretation" and agreed with the *Meineker*

court's interpretation that "comparable" requires more than simply an unobstructed view. 232 F.Supp.2d 1092, 1112–13 (C.D.Cal.2002). Therefore, it held that Section 4.33.3 clearly required the movie theater owner to provide "comparable viewing angles for its wheelchair-bound customers in its stadium-style theaters." *Id.* at 1114. In accordance with that, it ruled that AMC Theaters that placed wheelchair-accessible seating only in the traditional seating sections of their theaters was in violation of the ADA. *Id.* at 1112. *AMC Entertainment* did not address the "integral" requirement of Section 4.33.3 at all.

In assessing these prior cases, two things become clear. First, the comparable "lines of sight" requirement of Section 4.33.3 has met with different interpretations, and there is no clear majority viewpoint. The *Lara* cases ruled that wheelchair-seats need only be situated *among* the general seating area and provide unobstructed views. *Lara,* 207 F.3d at 789; *Oregon Paralyzed Veterans,* 142 F.Supp.2d. at 1297–98. *Meineker* held that comparable "lines of sight" required more than an unobstructed view from the general seating area. *Meineker,* 216 F.Supp.2d at 18. Specifically, it held that wheelchair seating in the very first row of the traditional section of a stadium-style theater does not offer a comparable line of sight to that which the general public enjoys, but it does when situated in the center and rear of the traditional section. *Id.* Contrarily, *AMC Entertainment* ruled that only placing wheelchair seating in the traditional section (no matter where it was

---

10. *Lara* did not address the "integral" requirement of Section 4.33.3, although the Government did argue for the integral components violation in its *amicus* brief. *Lara v. Cinemark U.S.A., Inc.,* 207 F.3d 783; Gov't.'s Suppl. Subm. at 5; Hoyts' Suppl. Brief [Docket No. 159] at 8–9. *Oregon Paralyzed Veterans* and *Cinemark U.S.A.* rejected the argument but did not explain their reasoning. *Oregon Paralyzed Veterans,* 142 F.Supp.2d at 1298, note 3. *Cinemark,* No. 99–705, slip-op, at 18 (N.D.Ohio Nov. 19, 2001).

placed within the section) of a stadium-style theater did not meet the requirements of comparable "lines of sight." *AMC Entertainment,* 232 F.Supp.2d. at 1112. As for the "integral part" of the fixed seating plan requirement, only *Meineker* addressed this issue in any meaningful sense, and the Court declines to follow its interpretation.

## B. Comparable Lines of Sight Requirement

█ The Government's position that the comparable "lines of sight" requirement in Section 4.33.3 encompasses an analysis of viewing angles relative to the screen, and does not simply mean an unobstructed view, is eminently reasonable.[11] The Court, as stated previously, indicated during oral argument that it was inclined to disregard the "line of sight" portion of the Government's arguments and, instead, concentrate on the integration requirement of Section 4.33.3. 9/12/02 Motion Hrg. Tr. at 8, 11. 1–13.; *Id.* at 7, 11. 7–9, 18–25. Upon further reflection, however, the Court now rules that, although the Luchetti standard[12] the Government has submitted is unsupportable, the Cinemas' argument that the comparable "lines of sight" requirement of Section 4.33.3 merely mandates an "unobstructed view" of the screen is just as unavailing.

As the courts in *Meineker,* 216 F.Supp.2d at 18, and *AMC Entertainment,*

232 F.Supp.2d. at 1110–1112, have recently indicated, "lines of sight" is a "qualitative requirement" and viewing angles are truly the only operative way of measuring whether the line of sight offered by a seat is "comparable" to those offered to the general public. Further, this Court agrees with the Government that "lines of sight" as used in Section 4.33.3 means more than whether or not the view is obstructed and that

"an analysis of the quality of the 'lines of sight' . . . involves more than just examining the presence (or absence) of visual obstructions. It also includes an assessment of whether the lines of sight to the screen are at such angles that they cause distortion to the image [on the screen], lead to physical discomfort for the viewer, or render the image overwhelming [sic] large or conversely, too small."

Gov't.'s Affirmative Statement ¶ 10. The motion picture industry itself has admitted as much via writings by the National Association of Theater Owners and other treatises and papers written by major studios (such as Lucasfilm). *AMC Entertainment,* 232 F.Supp.2d. at 1099–1103. These writings effectively show that viewing angles must be considered when defining "lines of sight" and that seats in the middle and rear of the theater offer the best viewing angle, while the seats in the front

---

**11.** The Government did not move for summary judgment on this matter because it believed an application of its proposed reading of Section 4.33.3 would raise disputed factual issues regarding "as built" seating configurations in the stadium-style theaters involved in this case. The Cinemas contend this is a factual issue. *See* Sep. 12, 2002 Hearing Transcript at 6, 11. 11–20. As will be seen below, no genuine issue as to a material fact is presented.

**12.** In reviewing a novel, the incomparably witty and acidic Dorothy Parker once wrote: "This is not a novel to be tossed aside lightly. It should be thrown with great force." The Court makes the same observation regarding the Luchetti Report. This report is confusing, overlong, and, just as the Cinemas contend, "absurdly demanding." Incredibly, (as noted by Cinemas *infra*) under the standard articulated in this report, many stadium-seats would fail to offer suitable viewing angles and—in some theaters—no single seat would pass muster.

offer the worst. *Id. See also* Gov't.'s Affirmative Statement ¶¶ 11–24.

This Court now rules (notwithstanding the contrary reasoning in the *Lara* decision) that the comparable "lines of sight" requirement of Section 4.33.3 means that viewing angles *must* be taken into account. For this reason alone, the Cinemas' motions for summary judgment must be denied as matter of law.

■ Because the Court has ruled that viewing angles must be taken into account when determining if the requirements of Section 4.33.3 are met, the question becomes whether seats in the traditional seating section located in front of the stadium seating section can possibly offer a line of sight "comparable" to that offered the general public. This Court follows *AMC Entertainment* in ruling that stadium-style theaters cannot possibly offer "lines of sight comparable to those for members of the general public" when wheelchair-accessible seats are placed *only* in the traditional-seating section, whether on risers or otherwise. Wheelchair-accessible seating located on the access-aisle, while certainly offering a better viewing angle than in the traditional seating section, also cannot match the viewing angles of the stadium seats (and are frequently obstructed by patrons exiting during the show to use the lavatory), and, therefore, such seating also cannot meet the demands of Section 4.33.3.

As a matter of simple geometry, the seats on the access-aisle and in the traditional seating section *always* offer an inferior viewing angle to the stadium-seats. Given the fact that the majority of seats in *all* of the auditoriums at issue are stadium seats, it is impossible for the Cinemas' stadium-style theaters to comport with the comparable "lines of sight" requirement of Section 4.33.3 *as matter of law*, absent wheelchair accessible seating in the stadium section. No detailed factual findings on this subject at a trial are necessary.

This Court does *not* rule that the ADA, through Section 4.33.3, requires wheelchair-accessible seating in theaters (constructed after 1993) be the *best* seats in terms of "lines of sight," but it does prohibit the wheelchair seating from being the worst. Therefore, as long as there is appropriate means of access, such as an elevator, placing the wheelchair seating in the last rows of the stadium seating section is permissible given that the viewing angle offered by these seats is not the worst available. *See e.g., AMC Entertainment,* 232 F.Supp.2d. at 1099–1103 (citing different authorities that state that lines of sight from the traditional section are inferior to that of the stadium section and that the rear of the auditorium is a better alternative).[13] When wheelchair-accessible seating is located only in the traditional seating section, or in the traditional section *and* on the access-aisle, or *only* in the access-aisle, however, it is not in compliance with the ADA and section 4.33.3. In short, in order to comply with the comparable "lines of sight" requirement of 4.33.3, this Court rules that wheelchair seating must be offered in the stadium-seating section of a stadium-style theater.

### C. Integral Part Requirement

Section 4.33.3 also requires that wheelchair-accessible seating be "an integral part of any fixed seating plan." 28 C.F.R. pt. 36, App. A, § 4.33.3. The Government argues that this means wheelchair-accessible seating cannot be placed in a completely separate section. Gov't.'s Consolidated Opp'n at 16–17.

---

**13.** This assumes, of course, that the last rows are also on the same size tiers or risers that are used in the rows immediately in front of them.

The Cinemas argue that this section of the regulation requires only that the handicapped seating be *among* the seats available to the general public. Hoyts' Mem. at 14–15; National Amusements' Mem. at 20. They submit that the Accessibility Guidelines Manual, published in 1998, supports this view, when it counsels:

> Integrated settings are an important principle of access. Even where wheelchair spaces are not required to be dispersed, it is important they be provided *within the footprint* of the seating layout. (Bleachers with notches or cut out areas will provide both integration and companion seating.)

Hoyts' Supplemental Br. at 4–7 (emphasis added). While this regulation seems to further the Cinemas' position, it is vague and actually unhelpful. It begs the question: *Where* within "the footprint"?

Section 4.33.3, of course, applies not just to movie theaters, which are comparatively small, but also to concert halls and sporting arenas, which also have assembly seating. These facilities naturally have numerous levels and different sections, all separated from each other. However, while a sports stadium, for example, has a wide range of sections, a stadium-style movie theater has only two, and one is plainly worse than the other. Pointing out that one type of facility to which Section 4.33.3 applies necessarily has many different sections does not aid the Cinemas' position. While Section 4.33.3 may provide exceptions for seating in "bleachers, balconies and other areas," the traditional seating section of a movie theater cannot be characterized as any of these. The traditional section is a markedly inferior and comparatively undesirable section in the front of the theater, not a back row within the stadium seating section with separate access and exit, which is permissible.

Section 4.33.3 calls for wheelchair-accessible seating to be an integral (necessary and unified) part of the "fixed seating plan." Seats in a separate front section where no-one would sit willingly, given the superiority of the stadium section are neither "necessary" nor "part of" the whole. The "fixed seating plan," in the case of stadium theaters, is the seating plan for the stadium section, the heart of the whole enterprise. The Court recognizes (as did the court in *AMC Entertainment*, 232 F.Supp.2d. at 1111) that Section 4.33.3 was written with varied facilities in mind and its drafters never considered the possibility of stadium-style seating in a movie theater.[14] Common sense dictates, however, that seating located in a totally separate, and ofttimes sectioned-off, area in the front of the theater cannot be an "integral" part of that theaters "fixed seating plan."

### D. Deference to the Government's Standard

 The Court must give deference to the agency's basic interpretation of Section 4.33.3 because courts of law must defer to agency interpretations of regulations unless these interpretations are "plainly erroneous or inconsistent with" the regulation. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (same). "The [Justice] Department's views are entitled to deference" when interpreting Title III of the ADA because it

---

**14.** The Court also recognizes, as the Cinemas point out, that the Government only advanced its "integral" theory argument at the commencement of the *Lara* litigation in an amicus brief, well after many of the individual theaters involved in this case were already built or under construction. *See* Gov't.'s Supplemental Br. at 5; Hoyts' Supplemental Br. at 8–9.

is the agency "directed by Congress to issue implementing regulations . . ., to render technical assistance explaining the responsibilities of covered individuals and institutions . . ., and to enforce Title III in court." · *Bragdon v. Abbott*, 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). "Unless an alternative reading is compelled by the regulation's plain language or by other indications of intent . . . at the time of the regulation's promulgation," a court must defer to the agency interpretation. *Thomas Jefferson Univ.*, 512 U.S. at 512, 114 S.Ct. 2381. The agency's interpretation of Section 4.33.3 is not erroneous, nor inconsistent with the plain language or intent of the regulation.

The Government's arguments in this case are not inconsistent with those it has been making since *Lara* and are not simply *post hoc* rationalizations or a "convenient litigati[on] position" in violation of *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 212–213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). Rather, the Government's position regarding Section 4.33.3 is consistent with the regulation and has been consistently maintained by the Government at least since the *Lara* litigation. The position, therefore, is entitled to deference. *Auer v. Robbins*, 519 U.S. at 462, 117 S.Ct. 905; *AMC Entertainment*, 232 F.Supp.2d. at 1113 (giving deference to the Government's interpretation of Section 4.33.3 as it relates to comparable "lines of sight" because its position is consistent with the regulation and represents its "fair and considered judgment").

### E. The Principles of the ADA and Section 4.33.3

■ The Cinemas' proposed interpretation also ignores the rule that regulations be interpreted in a manner consistent with the principles of the underlying statute. *Campesinos Unidos v. U.S. Dep't of Labor*, 803 F.2d 1063, 1069 (9th Cir.1986) (holding that a reviewing court must interpret a regulation as part of the overall regulatory and statutory scheme). For the Cinemas to argue that a seat need only be inside a stadium-style theater, "fixed" into the ground, and offer an obstructed view of the screen to comply with Section 4.33.3—a statute that calls for handicapped persons to be provided with the full and fair enjoyment of goods, services, and facilities "in the most integrated setting appropriate", 42 U.S.C. § 12182(b)(1)(B), in a way that is equal, 42 U.S.C. § 12182(b)(1)(A)(ii), and not unnecessarily separated or different from other individuals, 42 U.S.C. § 12182(b)(1)(A)(iii)—is simply unconvincing. Handicapped persons who must use a wheelchair cannot "participate in or benefit from" the "advantage" of stadium-style seating in a movie theater if they are never given access to it. 42 U.S.C. § 12182(b)(1)(A)(ii). Thus the Cinemas' interpretation is not consistent with the principles underlying the ADA itself and, therefore, is indefensible.

### F. Wheelchair–Accessible Seating that Meets the Comparable "Lines of Sight" and "Integral" Requirements of 4.33.3

■ The Cinemas' motions for summary judgment are denied. In order to comply with the "integral part" requirement of 4.33.3, this Court rules that wheelchair seating must be offered where the majority of the seating is placed—in the stadium-seating section of a stadium-style theater. Therefore, to comply with the "integral part" *and* the comparable "lines of sight" requirements of 4.33.3, there must be wheelchair accessible seats somewhere in the stadium section, and the rear of the stadium section is acceptable so long as it is a truly integrated part of the stadium

section.[15] Offering wheelchair seating only in the access-aisle, or only in the traditional section, or in both, is not sufficient to comply with the ADA.

Since the legal analysis of the Cinemas' motions for summary judgment generally resolves the liability issue in the Government's favor, the Court does not hesitate so to declare, notwithstanding that the Government itself did not move for summary judgment. *See Andrews v. DuBois,* 888 F.Supp. 213, 220–221 (D.Mass.1995) and cases cited.

### III. WHAT NOW?

The Cinemas make one last contention now that all else is lost. They argue that due process requires that the Court's declaration ought operate only prospectively. *See e.g.,* Hoyts' Supplemental Br. at 16–18. They are right.

■ Due process requires that legislation and regulations be sufficiently clear so as to provide fair warning of what is prohibited. *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). As the Supreme Court stated a long time ago in a related context:

> [The] basis [for an administrative action] must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, [w]e must know what a decision means before the duty becomes ours to say whether it is right or wrong.

*SEC v. Chenery Corp.,* 332 U.S. 194, 196–197, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947) (internal citations omitted); *Harrington v.*

*Chao,* 280 F.3d 50, 60 (1st Cir.2002) (same).

Most of the theaters at issue in this litigation were built or under construction before the Government adopted and made public its present interpretation of Section 4.33.3. Hoyts' Supplemental Br. at 2, note 3; National Amusements' Supplemental Br. at 9. It is undisputed that the Government first advanced its "integral" theory argument at the commencement of the *Lara* litigation in an amicus brief. *See* Gov't.'s Supplemental Br. at 5; Hoyts' Supplemental Br. at 9. In *Lara,* however, the Government *lost,* so it is hard to consider the brief as providing fair warning or "notice." In addition, the brief in *Lara* was just that, a brief, a court filing, and hardly as definitive a statement as a new regulation or clearer Accessibility Guidelines. The Accessibility Guidelines that *were* published, such as the 1998 Guidelines quoted above, with their requirement that wheelchair-accessible seating simply be "in the footprint" of the fixed seating plan were unhelpful.

Of course, the Department of Justice did consider modifying Section 4.33.3 after adopting its current position in the *Lara* case in July of 1998. Accessibility Guidelines Proposed Rules, 64 Fed.Reg. 62,248, 62,277 (Nov. 16, 1999) (codified at 36 C.F.R. pt. 1190 & 1191). In considering proposed changes, the Access Board stated:

> DOJ has asserted in attempting to settle particular cases that wheelchair seating locations [in stadium-style theaters] must: (1) Be placed within the stadium-style section of the theater ... (2) provide viewing angles that are equivalent to or better than the viewing angles ... provided by 50 percent of the seats in

---

**15.** The row in which these wheelchair seats are located must rest on its own elevated tier, equal in elevation differential to the other stadium-seating rows.

the auditorium, counting all seats of any type sold in that auditorium; and (3) provide a view of the screen, in terms of lack of obstruction ... that is in the top 50 percent of all seats of any type sold in the auditorium. The Board is considering whether to include specific requirements in the final rule that are consistent with the DOJ's interpretation of 4.33.3 to stadium-style movie theaters. 64 Fed.Reg. at 62,278.

In fact, on April 2, 2002, a new "draft" regulation was published by the Access Board that included a viewing angle requirement. Exhibit B to National Amusements' Supplemental Br., Draft Final ADA and ABA Accessibility Guidelines, April 2, 2002, 36 CFR Parts 1190 and 1191. Section 221.2.3 states that *"wheelchair spaces* shall be dispersed and shall provide spectators in *wheelchair spaces* with a range of seating locations and viewing angles equivalent to, or better than, the range of seating locations and viewing angles available to all other spectators." *Id.* at 2. Still, to date, no new regulation has been passed.

The Government argues that, even though no new regulation clarifying the issue has been passed, and even though Accessibility Guidelines are opaque on the issues of viewing angles and integration, Section 4.33.3 is so obvious on its face that there is no way the Cinemas could have supposed they were in keeping with its requirements when they built their theaters, even if on the whole, construction of most of the individual theaters pre-dates the Government's amicus brief in *Lara.* Gov't.'s Suppl. Subm. at 4–7. The Cinemas were, in the Government's view, deliberately placing most if not all of their wheelchair-accessible seats in the worst section of the theater, completely separate from the good seats. *Id.* The Government points to examples in the record in which architects, working on Hoyts' theaters, warned Hoyts that it should place wheelchair-accessible seats in the stadium section to avoid litigation; Hoyts' executives responded that the architects should eliminate wheelchair-accessible seating in the stadium sections to keep costs down and because "there was enough precedent to argue in court to do this." Gov't's Aff. Facts ¶¶ 94–97; *see also* Gov't.'s Supplemental Br. at 5–6.

As it turns out, while the architects were right, this Court simply cannot ignore the undisputed fact that, until *Meineker,* the Government's proffered interpretation had received short shrift in the courts, and, indeed, remains rejected outright within the borders of the 5th Circuit. Moreover, the Cinemas are not entirely wrong to castigate the Government for engaging in judicial legislation. National Amusements' Mem. at 2; 9/12/02 Motion Hearing Tr. at 18, 11. 9–25. The best way to bring about nationwide changes in the configuration of stadium-style theaters is to promulgate a new rule after a period of notice and comment.[16] It has been *four and one-half years* since the Department of Justice first publicly adopted its current interpretation of Section 4.33.3, and yet no new rule has passed. The common complaint of industries affected by the ADA and rulemaking procedures is that the process takes too long. This is particularly true here. Stadium seating has existed for over seven years and the Government has been well aware that it had to make itself more clear, yet it has remained lethargic in its rulemaking capacity and has instead chosen to bring lawsuits all over the country against various theater chains. This con-

---

16. But for the Government's obduracy, it appears possible to have resolved this dispute via rulemaking settlement. *See generally* Jim Rossi, *Bargaining in the Shadow of Administrative Procedure: The Public Interest in Rulemaking Settlement,* 51 Duke L.J., 1015 (2001).

duct argues strongly in favor of making the relief in this case prospective. As matter of policy, the executive should be discouraged from attempting to get the courts do for it what it ought do for itself through the rulemaking process.

## IV. CONCLUSION

For the reasons set forth above, the Cinemas' Motions for Summary Judgment [Docket Nos. 103 & 112] are DENIED.

Judgment shall enter declaring that, with respect to all stadium-style theaters owned or leased by Cinemas wherein construction or refurbishment (that is, any change that requires a building permit under local law) occurs on or after the date upon which this lawsuit commenced, Section 4.33.3 requires that wheelchair-accessible seating must be located within the stadium section. To be clear, to comply with Section 4.33.3, wheelchair seating cannot be located solely in the traditional section, nor solely in the access-aisle, nor solely in both the traditional section and access-aisle.

SO ORDERED.