RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0395P (6th Cir.)
File Name: 03a0395p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellant,*

*v.*

No. 02-3100

CINEMARK USA, INC.,
*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-00705—Donald C. Nugent, District Judge.

Argued: June 20, 2003

Decided and Filed: November 6, 2003

Before: DAUGHTREY and ROGERS, Circuit Judges;
QUIST, District Judge.*

_____

## COUNSEL

**ARGUED:** Gregory B. Friel, UNITED STATES
DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION,

_____

*The Honorable Gordon J. Quist, United States District Judge for the
Western District of Michigan, sitting by designation.

---

APPELLATE SECTION, Washington, D.C., for Appellant.
Laura M. Franze, AKIN, GUMP, STRAUSS, HAUER &
FELD, L.L.P., Dallas, Texas, for Appellee. **ON BRIEF:**
Gregory B. Friel, Jessica Dunsay Silver, UNITED STATES
DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION,
APPELLATE SECTION, Washington, D.C., for Appellant.
Laura M. Franze, M. Brett Burns, AKIN, GUMP, STRAUSS,
HAUER & FELD, L.L.P., Dallas, Texas, for Appellee. David
K. Monroe, GALLAND KHARASCH GREENBERG
FELLMAN & SWIRSKY P.C., Washington, D.C., Jeffrey T.
Kubes, CRISHAM & KUBES, Chicago, Illinois, for Amici
Curiae.

_____

## OPINION

_____

ROGERS, Circuit Judge. The district court in this case
granted summary judgment against the United States in its
suit against Cinemark USA, Inc. (Cinemark) under Title III of
the Americans with Disabilities Act (ADA). The government
alleged that Cinemark has violated the ADA by designing,
constructing, and operating stadium-style movie theaters in a
manner that discriminates against wheelchair-using patrons.
Specifically, the government argued that Cinemark was not
complying with the applicable Justice Department regulation,
ADAAG[1] § 4.33.3, which requires that "[w]heelchair areas
shall be . . . provided so as to provide people with disabilities
. . . lines of sight comparable to those for members of the
general public." The district court held as a matter of law that
Cinemark was in compliance because its theaters provided
wheelchair patrons with unobstructed views of the movie
screen from wheelchair seating located amid or adjacent to

_____

[1]The Department of Justice's enabling regulations under the
Americans with Disabilities Act are the Americans with Disabilities Act
Accessibility Guidelines, commonly referred to as the "ADAAG."

seating for the general public. The government correctly argues that the "line of sight" aspect of its regulation does not require merely that wheelchair users be provided unobstructed views of the movie screen, but instead requires *in addition* that the unobstructed views be "comparable" to those of other patrons. Accordingly, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

## BACKGROUND

### 1. Cinemark's Stadium-style Theaters

Cinemark constructs, owns, and operates movie theaters throughout the United States. In 1995, Cinemark began constructing "stadium-style" movie theaters. Stadium-style theaters have a seating configuration that rises at a relatively steep grade,[2] typically making stadium-style sections of these theaters impossible to navigate by wheelchair-using patrons. In Cinemark's stadium-style theaters, wheelchair placements are generally located on a flat portion of the auditorium approximately one-third of the way back from the screen. This placement is in the third row of fixed seating, with two rows of general public seating in front, and near the entrances and exits to the theaters.[3] Wheelchair placements are also located on a flat portion in the rear of the auditorium in Cinemark's theaters that seat 300 or more people. These placements are accessed by elevators. Over 80 percent of the general seating in Cinemark's stadium-style theaters is located in the stadium section.

The government alleges that because of the placement of the wheelchair-accessible locations, wheelchair users are

---

[2]This grade is often greater than 5%.

[3]Cinemark stresses that this latter detail is of prime importance in the event of an emergency.

sometimes forced to look up at the screen at sharp angles, resulting in severe discomfort and pain. According to the government, these and similar problems have made Cinemark's stadium-style theaters effectively unusable by persons confined to wheelchairs.

### 2. *Title III of the ADA and the Justice Department's Regulation, ADAAG § 4.33.3*[4]

Disability-based discrimination in public accommodations is prohibited under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182. Title III generally requires that public accommodations designed and constructed "for first occupancy" after January 26, 1993,[5] be "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a)(1). Cinemark's stadium-style movie theaters were built starting in 1995 and are therefore subject to Title III's requirements for new construction.

Congress gave the Attorney General the responsibility to promulgate regulations implementing the provisions of Title III of the ADA. *See* 42 U.S.C. § 12186(b). These regulations must be consistent with the minimum guidelines issued by the Architectural and Transportation Barriers Compliance Board (the "Access Board"). *See* 42 U.S.C. § 12186(c). In 1991, the Department of Justice (the "DOJ") issued regulations, known as the Standards for Accessible Design, which incorporated the Americans with Disabilities Act Accessibility Guidelines ("ADAAG") promulgated by the Access Board. *See* 56 Fed. Reg. 35,546 (July 26, 1991); 28 C.F.R. 36.406(a); 28 C.F.R. Pt. 36, App. A. The ADAAG

---

[4]Also referred to as "Standard 4.33.3" or "§ 4.33.3."

[5]The language of the statute reads: "failure to design and construct facilities for first occupancy later than 30 months after the date of enactment of this Act [enacted July 26, 1990]."

were promulgated under the notice-and-comment procedures of the Administrative Procedure Act, 5 U.S.C. § 553 (1998).

This appeal concerns one of DOJ's regulations under Title III of the ADA, known variously as Standard 4.33.3 or ADAAG § 4.33.3. This regulation provides that in "assembly areas,"

> *Wheelchair areas* shall be an integral part of any fixed seating plan and *shall be provided so as to provide* people with physical disabilities a choice of admission prices and *lines of sight comparable to those for members of the general public.* They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.
>
> EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

28 C.F.R. Pt. 36, App. A, § 4.33.3 (emphasis added).

### 3. *The DOJ's Certification of Local Accessibility Standards*

The Department of Justice is authorized under Title III of the ADA to certify that state or local accessibility standards meet or exceed the ADA Standards for Accessible Design. The DOJ explained the advantages of this process in a publication on its website entitled "Certification of State and Local Building Codes":

> Code certification facilitates voluntary compliance by putting ADA requirements and local requirements into a single, readily available document. It allows builders to rely on their local inspection and approval processes, and it ensures that accessibility will be routinely considered in those processes. It allows builders to be assured of compliance through inspections early in the construction process, when mistakes can be corrected relatively easily and cost-effectively. It eliminates conflicts between local requirements and ADA requirements. Finally, by incorporating ADA-equivalent accessibility provisions into the local code, certification gives building officials a significant role in enforcing the substance of the ADA.

J.A. at 154. Certification serves as "rebuttable evidence" that a state law or local ordinance meets or exceeds the minimum requirements of the ADA in a later federal enforcement proceeding, *see* 42 U.S.C. § 12188(b)(1)(A)(ii), and compliance with a certified code is "rebuttable evidence" of compliance with Title III of the ADA.

The State of Texas has promulgated building codes related to requirements under Title III of the ADA, known as the Texas Accessibility Standards ("TAS"). The TAS were certified as meeting or exceeding federal accessibility requirements by the DOJ on September 23, 1996. Following this certification, the DOJ issued a press release which stated:

> Builders in Texas who follow state building codes can be assured that they are complying with federal guidelines as well, now that the Justice Department has certified Texas codes as being in compliance with the Americans with Disabilities Act . . . .
>
> "*Everyone in the state of Texas—builders, architects, business owners, and the general public—will benefit from Texas' new accessibility standards*" . . . . "*Certification makes it easier to comply with the law.*"

. . . Builders will benefit from this new process because it ensures that construction which meets state codes meets the requirements of the ADA. Builders will also have additional legal protection in ADA lawsuits if they build in compliance with the certified code.

J.A. at 153. The TAS includes a "Section 4.33.3," which is modeled after the language of ADAAG § 4.33.3. Cinemark received certification of its compliance with TAS accessibility requirements for many of its stadium-style theaters built in Texas between 1995 and 1998. Cinemark relied upon this certification of compliance when designing and building its theaters in Texas and throughout the United States.

*4. The Access Board's New Notice of Proposed Rulemaking*

On November 16, 1999, the Access Board published a new Notice of Proposed Rulemaking in the Federal Register for public notice and comment. *See* 64 Fed. Reg. 62248, 62278 (1999). The notice proposed modifications to ADAAG § 4.33.3 not relevant here, but in a preamble to the proposed revision, the Access Board noted that it was "aware" of DOJ attempts to enforce DOJ's interpretation of ADAAG § 4.33.3 through litigation, and stated that the Board was "considering whether to include specific requirements in the final rule that are consistent with DOJ's interpretation of 4.33.3 to stadium-style movie theaters." *Id*. A new final rule has not yet been adopted.

*5. Procedural History*

On March 24, 1999, the government sued Cinemark in the United States District Court for the Northern District of Ohio, alleging that Cinemark had engaged in a pattern or practice of discrimination in violation of Title III of the ADA, 42 U.S.C. 12181 *et seq*., and its implementing regulations. Specifically, the complaint alleged that many of Cinemark's stadium-style theaters throughout the United States failed to comply with ADAAG § 4.33.3, 28 C.F.R. Pt. 36, App. A, § 4.33.3. The

government requested a declaratory judgment stating that Cinemark violated Title III of the ADA by designing, constructing, and operating stadium-style movie theaters in a manner that discriminates against wheelchair-using patrons. The government further requested that: (1) Cinemark be ordered to bring its present stadium-style movie theaters into compliance with Title III; (2) Cinemark be enjoined from designing or constructing additional stadium-style theaters unless such theaters are in compliance with Title III; (3) Cinemark be ordered to provide remedial relief, including compensatory damages, to all individuals with disabilities who were discriminated against by Cinemark in violation of Title III; and (4) Cinemark be assessed a civil penalty.

In December of 2000, Cinemark moved for summary judgment on all claims asserted by the government, contending that all of its stadium-style theaters complied with Title III of the ADA and ADAAG § 4.33.3. The government also moved for partial summary judgment on whether some of Cinemark's stadium-style theaters were in violation of ADAAG § 4.33.3. On November 19, 2001, the district court granted Cinemark's motion for summary judgment, denied the government's cross-motion, and entered final judgment for Cinemark. The district court held that, as a matter of law, Cinemark's stadium-style movie theaters complied with ADAAG § 4.33.3 because they provided patrons that use wheelchairs with unobstructed views of the movie screen from wheelchair seating located amidst or adjacent to seating for the general public, and this is all that was required under the plain language of that regulation.

**ANALYSIS**

*1. Standard of Review*

We review a district court's decision to grant summary judgment *de novo*. *Thomas v. United States*, 213 F.3d 927, 929 (6th Cir. 2000). The moving party has the burden of establishing that there are no material factual disputes, and

that it is entitled to judgment as a matter of law. *Id*. There are no factual disputes in the present appeal; therefore, resolution of this case depends on our determination of what is required under the plain meaning of ADAAG § 4.33.3 and whether the DOJ's interpretation of ADAAG § 4.33.3 is reasonable and entitled to deference as a matter of law. Because the plain meaning of ADAAG § 4.33.3 requires more than merely unobstructed views of the movie screen, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion. The alternative grounds asserted by Cinemark, moreover, do not require affirmance of the district court's judgment.

2.  *ADAAG § 4.33.3 Does Not Require Merely That Wheelchair-using Patrons Have Unobstructed Views of the Movie Screen*

The regulation at issue appears plainly to require that wheelchair patrons have something more than a merely unobstructed view in seating adjacent to other patrons. While we agree that "line of sight" can be defined as unobstructed view, the regulation requires more than "lines of sight" for wheelchair patrons. It requires *comparable* lines of sight. While the word "comparable" can mean "capable of being compared," such an interpretation would give the word no substantive content in this context. The other—obviously intended—meaning of "comparable" is "similar." Thus, in ordinary parlance, if the prices at one store or restaurant are ten times those of a competitor, one would not say that the prices are "comparable," even though they can obviously be compared. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 234 (10th ed. 1997) (definitions for "comparable" include "similar, like" as in "fabrics of comparable quality").

The regulation thus is plain in its requirement that the wheelchair lines of sight be similar, or at least roughly similar, to those of other patrons. The criteria for evaluating similarity, moreover, while not explicit in the regulation,

doubtless include viewing angle.[6] Several district courts have come to precisely this conclusion. *See United States v. Hoyts Cinemas Corp.*, 256 F.Supp.2d 73, 88 (D.Mass. 2003) (relying upon federal district court decisions in New York and California to conclude that "viewing angles are truly the only operative way of measuring whether the line of sight offered by a seat is 'comparable' to those offered to the general public"). And the Ninth Circuit has recently held that it was reasonable for the DOJ to interpret "comparable line of sight" to encompass factors such as viewing angle. *Oregon Paralyzed Veterans of America v. Regal Cinemas*, 339 F.3d 1126, 1132-33 (9th Cir. 2003).

Moreover, as argued by the government, interpreting the "lines of sight" portion of ADAAG § 4.33.3 to require that wheelchair users be provided with comparable viewing angles, not just an unobstructed view of the movie screen, furthers the central goals of Title III of the ADA. The ADA fundamentally requires that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). The thrust of that mandate leads us to conclude that the term "lines of sight comparable to those for members of the general public" requires that wheelchair users be afforded comparable viewing angles to those provided for the general public. Only

---

[6]Treatises cited by the government support the contention that within the field of theater design, "lines of sight" are compared on the basis of viewing angles. *See* George C. Izenour, THEATER DESIGN 3-4, 284 (1977); Harold Burris-Meyer & Edward C. Cole, THEATERS AND AUDITORIUMS 68-69 (2d ed. 1964). Cinemark argues in response that the DOJ has waived its right to rely on such treatises because it did not present them to the district court below. To the extent that the treatises reflect the meaning of the term "comparable lines of sight," we may refer to them just as appropriately as we would refer, say, to a dictionary that was not cited below. The treatises give some support to the government's contended meaning of "comparable lines of sight," and we do not rely upon them for anything more than that.

then will wheelchair users have "equal enjoyment" with the general public. Under the district court's interpretation, a wheelchair-using patron could be relegated to the worst seats in the theater (assuming it was still among some seats for the general public), so long as the disabled patron still had an "unobstructed view" of the screen. This does not comport with the "full and equal enjoyment" language of Title III, nor does it seem likely that this is all the DOJ and the Access Board were attempting to guarantee for disabled persons when they formulated ADAAG § 4.33.3. A more reasonable interpretation of ADAAG § 4.33.3, given the purpose of Title III, is that the DOJ and the Access Board intended to assure disabled patrons seats of "comparable" quality to those provided for members of the general public.

Cinemark urges us to uphold the district court's very different understanding of the "line of sight" regulation. That understanding is based on the Fifth Circuit's holding in *Lara v. Cinemark USA, Inc.*, 207 F.3d 783 (5th Cir. 2000). The *Lara* court rejected the contention that "the phrase 'lines of sight comparable' requires anything more than that theaters provide wheelchair-bound patrons with unobstructed views of the screen." 207 F.3d at 789. Accordingly, the Fifth Circuit held that in the absence of a more specific regulation, ADAAG § 4.33.3 "does not require movie theaters to provide disabled patrons with the same viewing angles available to the majority of non-disabled patrons." *Id.*

The arguments relied upon by the Fifth Circuit in *Lara* are, however, in the end not persuasive. First, the *Lara* court noted that "questions regarding 'viewing angle' did not arise until well after the DOJ promulgated section 4.33.3." 207 F.3d at 788. The *Lara* court found it significant that the Access Board, in proposing to modify § 4.33.3, proposed to define "line of sight" problems in the context of obstructed views, and recognized that "additional language would be necessary to codify the DOJ's litigating position." *Id.* The Fifth Circuit quoted the Access Board as follows:

DOJ has asserted in attempting to settle particular cases that wheelchair seating locations [in stadium-style theaters] must: (1) be placed within the stadium-style section of the theater . . .; (2) provide viewing angles that are equivalent or better than the viewing angles . . . provided by 50 percent of the seats in the auditorium, counting all seats of any type sold in that auditorium; and (3) provide a view of the screen, in terms of lack of obstruction . . . that is in the top 50 percent of all seats of any type sold in the auditorium. The Board is considering whether to include specific requirements in the final rule that are consistent with the DOJ's interpretation of 4.33.3 to stadium-style movie theaters. 64 Fed. Reg. at 62278.

*See Lara*, 207 F.3d at 788. Immediately preceding the language cited by the Fifth Circuit, however, the Access Board stated:

As stadium-style theaters are currently designed, patrons using wheelchair spaces are often relegated to a few rows of each auditorium, in the traditional sloped floor area near the screen. Due to the size and proximity of the screen, as well as other factors related to stadium-style design, patrons using wheelchair spaces are required to tilt their heads back at uncomfortable angles and to constantly move their heads from side to side to view the screen. They are afforded inferior lines of sight to the screen.

64 Fed. Reg. at 62278. This passage notes that wheelchair-using patrons are afforded "inferior lines of sight" because the close proximity to the screen of the wheelchair placements causes their viewing experience to be uncomfortable. It demonstrates that lines of sight have a qualitative aspect: lines of sight can be "inferior," not simply obstructed or unobstructed.

In addition, the language cited by the Fifth Circuit does not definitively support the conclusion that the Access Board

acknowledged that additional language will be necessary to codify the DOJ's litigating position. The Access Board explained that "[t]he Board is considering whether to include *specific* requirements in the final rule that are consistent with DOJ's interpretation of 4.33.3 to stadium-style movie theaters." 64 Fed. Reg. 62278 (emphasis added). The inclusion of the word "specific" implies that although the Board might think that the present language of ADAAG § 4.33.3 is broad enough to include the DOJ's interpretation, it is considering whether to make these requirements explicit in the final rule. The language of the Access Board with regard to the proposed modification of ADAAG § 4.33.3 at least equally supports an interpretation of that section that includes a qualitative element in the comparable "lines of sight" analysis.

Second, the Fifth Circuit noted that although "the phrase 'lines of sight' lacked a clear meaning in the ADA context, it is clear that in a number of other contexts, the phrase meant unobstructed view." *Id.* at 788. The Fifth Circuit cited three other, unrelated regulations that use "line of sight" to mean unobstructed view, including a Federal Communications Commission regulation requiring that antennae have line of sight, without obstruction, of the communities that they serve. *Id.* The fallacy of this argument is that ADAAG § 4.33.3 does not just require that wheelchair patrons have "lines of sight." They must be afforded *comparable* lines of sight. That requirement is perfectly consistent with interpreting "line of sight" to mean unobstructed view. The holding of the Fifth Circuit in *Lara* effectively ignored the phrase "comparable to those for members of the general public," and in so doing failed to take sufficiently into account the purpose of Title III of the ADA. The phrase, in the Fifth Circuit's interpretation, would be reduced to meaning simply a "similarly unobstructed" view. *See Meineker v. Hoyts Cinemas Corp.*, 216 F. Supp. 2d 14, 18 (N.D.N.Y. 2002), *vacated and remanded on other grounds*, 2003 U.S. App. LEXIS 13411 (2d Cir. 2003). This does not give sufficient meaning to the regulation.

Since *Lara* was decided, the Ninth Circuit and several district courts have rejected its reasoning. *See Or. Paralyzed Veterans of Am. v. Regal Cinemas*, 339 F.3d 1126, 1132-33 (9th Cir. 2003) (reversing *Or. Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 142 F. Supp. 2d 1293 (D. Or. 2001); *United States v. Hoyts Cinemas Corp.*, 256 F.Supp.2d 73, 84-89 (D. Mass. 2003); *Meineker*, 216 F. Supp. 2d at 17, *United States v. AMC Entm't, Inc.*, 232 F. Supp. 2d 1092, 1110-12 (C.D. Calif. 2002).

Our conclusion that the plain meaning of "lines of sight comparable to those for members of the general public" requires more points of similarity than merely an unobstructed view is further supported by DOJ's interpretation of ADAAG § 4.33.3. As a general matter, deference should be given to an agency's interpretation of a regulation when the agency has been given responsibility to issue regulations under the statute in question, to explain the responsibilities of those concerned under the statute, and to enforce the statute in court. *See Bragdon v. Abbott*, 524 U.S. 624, 646 (1998). The DOJ has these responsibilities in this context. *See* 42 U.S.C. § 12186(b); 42 U.S.C. § 12188(b)(1)(B). When an agency is interpreting its own regulations, even greater deference is due to the agency's interpretation. *See United States v. Midwest Suspension & Brake*, 49 F.3d 1197, 1203 (6th Cir. 1995). Therefore, the DOJ's interpretation should be upheld unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997). To be sure, we are not required to defer to the DOJ's interpretation if an "alternative reading is compelled by the regulation's plain language or by other indications of the [DOJ's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (*quoting Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). The Supreme Court has also indicated that deference to an agency's "convenient litigation position" would be "entirely inappropriate" where the agency's position is contrary to the view advocated by the agency in past cases and is not "reasoned and consistent."

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-213 (1988); *see Auer*, 519 U.S. at 462 (contrasting an agency's "*post hoc* rationalization" with a "fair and considered judgment") (internal quotation marks omitted). The DOJ position in this case is neither plainly erroneous nor inconsistent with the regulation. Nor is it inconsistent with views advocated by DOJ in earlier cases.

The DOJ argues that the "lines of sight comparable" portion of ADAAG § 4.33.3 includes a consideration of the quality of the viewing angle of the movie screen. This is consistent with our conclusion that the plain meaning of ADAAG § 4.33.3 requires that there be greater points of commonality between lines of sight than that the lines of sight share an unobstructed view; in order to be comparable, viewing angles must also be taken into account to some degree. Since this DOJ interpretation is consistent with the plain meaning of the regulation, it is entitled to deference. *See Auer*, 519 U.S. at 461.

We leave it to the district court on remand to determine the extent to which lines of sight must be similar for wheelchair patrons in stadium-style theaters, but hold that the plain meaning of "lines of sight comparable to those for members of the general public" clearly requires more points of similarity than merely an unobstructed view. In short, we disagree with the reasoning of the Fifth Circuit in *Lara*,[7] and

---

[7]Cinemark, citing *Colby v. J.C. Penney Co.*, 811 F.2d 1119 (7th Cir. 1987), also asserts that this court should give deference to the decision of the *Lara* court and follow that holding because to do otherwise would subject Cinemark to inconsistent legal obligations. In *Colby* the Seventh Circuit stated:

A posture somewhere in between some deference and complete deference is proper when cases in different circuits challenge the same practice of the same defendant, particularly if different outcomes would place the defendant under inconsistent obligations . . . . [T]he fact that [a previous] case involved the identical issue in a lawsuit brought against the identical

therefore conclude that the district court erred in holding that ADAAG § 4.33.3 merely required unobstructed views of the movie screen. We therefore reverse the judgment of the district court and remand for further proceedings in accordance with this opinion.

3. *The Alternative Grounds Advanced by Cinemark on Which to Affirm the Judgment of the District Court are Unpersuasive.*

Cinemark advances several alternative grounds that it argues require us to affirm the judgment of the district court. These grounds are (1) that the DOJ's interpretation of ADAAG § 4.33.3 amounts to a new substantive rule in

---

defendant by a plaintiff having the same interests as [the plaintiff in the current case] is a reason for the district court in the present case to have given serious consideration to the [previous] decision—but not a reason to invoke stare decisis and give the decision complete deference automatically, as the [lower] court appears to have done . . . . Where different outcomes would place the defendant under inconsistent legal duties, the case for the second court's not going into conflict with the first is particularly strong. A conflict would place the defendant in an impossible position unless the Supreme Court agreed to hear the case . . . .

*Id.* at 1124. As this quote makes clear, automatic deference to the decision of another circuit is not required, although there may be strong reasons for deference when to decide otherwise would subject a party to inconsistent legal duties. However, the "inconsistent legal obligations" that Cinemark will suffer from in this case do not appear to be insurmountable: any chain of stores that extends across state lines is subject to the different building codes of the various states in which it chooses to build a store (and probably to a variety of different local ordinances at each location as well). This is not such an "impossible position" as defendant would lead us to believe.

In any event, this consideration is insufficient to require us to change our interpretation of ADAAG § 4.33.3, particularly now that the Ninth Circuit has already created a split in the circuits on that legal issue in *Or. Paralyzed Veterans of Am. v. Regal Cinemas*.

circumvention of the Administrative Procedure Act's (the "APA's") notice and comment requirements; (2) that the government should be estopped from arguing for its interpretation of ADAAG § 4.33.3 because it approved the TAS, which Cinemark's theaters were built in compliance with; (3) that the government is precluded under the doctrine of collateral estoppel from re-litigating issues that it previously litigated unsuccessfully against Cinemark in *Lara*; and (4) that at the very least summary judgment should be given to Cinemark with regard to its theaters in the Fifth Circuit. None of these arguments provide alternative support for the district court's grant of summary judgment.

### A. The APA's Notice and Comment Requirements

Cinemark asserts that the DOJ's interpretation of ADAAG § 4.33.3 mandates new substantive requirements without undergoing notice and comment as required by the Administrative Procedure Act, 5 U.S.C. § 553. According to Cinemark, the DOJ's attempt to introduce a new quantitative viewing angles requirement imposes new obligations on theater construction, obligations that were not required under the plain meaning of ADAAG § 4.33.3, and therefore this requirement should have been implemented through the APA's notice-and-comment procedures.

This argument runs against a long-settled principle of federal administrative law. An agency's enforcement of a general statutory or regulatory term against a regulated party cannot be defeated on the ground that the agency has failed to promulgate a more specific regulation. *See SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974). "'The choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the

administrative agency.'" *Id*. at 293 (quoting *SEC v. Chenery*, 332 U.S. at 203).[8]

In the instant case the enforcement action is either warranted by the statute and the regulation or it is not. Since the action is so warranted, then (under *Chenery* and *Bell Aerospace*) nothing in the APA requires additional rulemaking. But even if the action were not warranted, then enforcement should be denied on that ground alone, and any APA notice-and-comment argument would be surplusage.

### B. Estoppel

Cinemark also asserts that the government should be estopped from asserting a "new" interpretation of ADAAG § 4.33.3 that invalidates approvals given pursuant to TAS, given that TAS was certified by the DOJ as "meeting or exceeding" the requirements of the ADA and Cinemark relied

---

[8] Moreover, even if the government's litigating position in the instant enforcement action were considered a "rule" subject to the APA, the exception to the notice-and-comment requirement for interpretive rules would apply. 5 U.S.C. § 553(b)(A). We have recognized the distinction between interpretive and substantive (or legislative) rules as follows:

> A legislative rule is one that "has the force of law," while an interpretive rule is "merely a clarification or explanation of an existing statute or rule" and is "'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Guardian Fed. Sav. & Loan v. Fed. Sav. & Loan Ins. Corp.*, 191 U.S. App. D.C. 135, 589 F.2d 658, 664-65 (D.C.Cir. 1978) (*quoting* U.S. Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)). Legislative rules "grant rights, impose obligations, or produce other significant effects on private interests," while interpretive rules do not "foreclose alternative courses of action or conclusively affect rights of private parties."

*Ohio Dep't of Human Servs. v. Dept. of HHS*, 862 F.2d 1288, 1233 (6th Cir. 1988). The government here is not even arguably relying upon the effect of its litigating position as independently substantively binding. Instead, it is arguing on the basis of its interpretation of ADAAG § 4.33.3.

upon these approvals.[9] Of course, with the possible exception of "affirmative misconduct," equitable estoppel does not run against the government. *E.g., Schweiker v. Hanson*, 450 U.S. 785 (1981). On the other hand, due process concerns may warrant denial of enforcement of an agency determination when conduct previously approved by a regulatory agency is retroactively branded as a statutory violation. As Judge Friendly colorfully expressed in the labor relations context:

> Although courts have not generally balked at allowing administrative agencies to apply a rule newly fashioned in an adjudicative proceeding to past conduct, a decision branding as "unfair" conduct stamped "fair" at the time a party acted, raises judicial hackles considerably more than [for instance, imposing a more severe remedy for conduct already prohibited]. And the hackles bristle still more when a financial penalty is assessed for action that might well have been avoided if the agency's changed disposition had been earlier made known, or might even have been taken in express reliance on the standard previously established.

---

[9] In its *amicus* brief, the American Institute of Architects (the "AIA") argues that reliance on state or local standards such as TAS that have been certified by the DOJ should shield a builder from liability. Its stated motivation in making this argument is to shield architects from liability that could result if the DOJ later finds that a theater is not in compliance with the ADA and the theater owner brings suit against the architect. The AIA argues that the certification process is a sensible way in which architects can determine in advance which designs are in compliance with the ADA, given the lack of clarity in the current regulations. According to the AIA, it has no interest in what the substantive requirements of the ADA are; it simply wishes to have a process by which architects can make certain that their plans comply with the ADA. Although we do not question the wisdom of such a process, we have no power to create such a process where the legislature and the executive have not taken sufficient steps to do so. Contrary to the AIA's assertion, the DOJ has expressly stated that certification is not a process on which architects can completely rely.

*NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966) (citations omitted). Cinemark's reliance on TAS and the government's statements with respect to the state building code certification process weigh strongly in favor of making any relief that the district court grants the government on remand apply only on a prospective basis. We do not go so far as to hold that any relief *must* be prospective to comport with due process, but note that, given the following facts, prospective relief will often be most appropriate.

The DOJ stated in numerous publications that approval given pursuant to state or local ordinances such as TAS constituted "rebuttable evidence" that the building was in compliance with the ADA. *See* 42 U.S.C. 12188(b)(1)(A)(ii); J.A. at 154. Even in the DOJ's press release announcing certification for TAS, the DOJ stated that "[b]uilders will also have additional legal protection in ADA lawsuits if they build in compliance with the certified code." J.A. at 153. The word "additional" is consistent with the other statements issued by the DOJ that compliance with TAS constitutes "rebuttable evidence" that the theater was in compliance with the ADA. This is not incontrovertible evidence; instead, it gives a presumption in favor of the builder, but that presumption may be overcome.

Because the DOJ's statements said that the certification of the state or local building ordinances was not something upon which the builder could completely rely, the district court should not be altogether barred from ordering some kind of remedial measures for existing facilities if the facts warrant such relief. The DOJ's statements also imply, however, that a cinema builder should be able to rely—at least to some degree—on the approval of their building plans by state or local inspectors that were certified by the DOJ. The phrases "rebuttable evidence" and "additional legal protection" indicate that a builder and the owner should have some measure of protection from an enforcement action by the government. The government has assured us that any remedial measures they will request on remand will take into

account the cost and feasibility that implementation of the measures would require, and that it would "work with [Cinemark] to come up with a reasonable approach."[10]

---

[10]At oral argument, the attorney from the DOJ stated that "I want to make very clear to the court, we have emphasized repeatedly the United States is not—has not and is not going to argue, for example, that the entire interior of the theater be gutted or torn down. We are going to work with the defendants to come up with a reasonable approach."

In response to a question from the court as to "the earliest date that the government . . . let the theater designers, owners, builders know that the government was taking the position that lines of sight included angles of viewing," DOJ counsel responded, "as far as a widely published document, it was the *Lara* brief filed in a district court in Texas in July of 1998."

DOJ counsel also acknowledged that there will be hard cases in which reasonable people will disagree about whether a wheelchair position is comparable to where most people sit. DOJ counsel stated that

in those situations, it is appropriate for a district judge to take into account notice and due process concerns in deciding whether there were any remedy. But what I'm saying is just because there are cases in some situations does not mean you can't order relief for situations where there's a clear violation where they are all in the front row.

DOJ counsel further emphasized that "we're not going to ask for an extreme remedy, because what has been suggested is that we're talking about gutting these theaters, and we understand as a practical matter once theaters are built, even though we believe some remedy is required, if in fact it's just—would essentially eliminate half the seats as [opposing counsel] would put in a ramp—we're not going to propose that as a remedy."

In response to a question from the court regarding whether wheelchair seating would have to be placed in the middle of the stadium seating instead of in the front of the stadium, perhaps thereby requiring an elevator to be put in, DOJ counsel responded: "where you have an elevated stadium section, certainly I think getting the wheelchair up to the first row of the stadium section, not the traditional style, would dramatically improve the experiences for people in wheelchairs." DOJ counsel subsequently indicated that "[f]or the typical stadium-style theater

---

Limited remedial measures such as those proposed by the DOJ at oral argument would fulfill the ADAAG § 4.33.3 requirement that wheelchair placements have "lines of sight comparable to those for members of the general public," but would also comport with due process by allowing Cinemark to rely on the approval of the TAS where that reliance was reasonable in light of ADAAG § 4.33.3. In short, in fashioning any remedy the district court, as a court of equity, can take into account previous advice and representations by the government upon which Cinemark or this court reasonably relied.

### C. Collateral Estoppel

Collateral estoppel does not bar the government from bringing this action against Cinemark. Cinemark contends that the government is precluded under the doctrine of collateral estoppel from relitigating issues against Cinemark that it and others previously litigated unsuccessfully against Cinemark in *Lara*. The Sixth Circuit has established a four-part test for determining whether and when collateral estoppel bars relitigation of an issue:

1) the precise issue raised in the present case must have been raised and actually litigated in the prior proceeding;

2) determination of the issue must have been necessary to the outcome of the prior proceeding;

3) the prior proceeding must have resulted in a final judgment on the merits; and

---

that we've seen, if the wheelchair space was up on the first row of that elevated section, I think, as a remedial matter, we would be satisfied."

Our holding in this case assumes that the DOJ will stand by these representations.

4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Aircraft Braking Sys. Corp. v. Local 856, Int'l Union*, 97 F.3d 155, 161 (6th Cir. 1996). The first three parts of this test are not contested in the present appeal. The government does contest the fourth prong, however, asserting that its role as an *amicus curiae* in *Lara* was not sufficient to satisfy this test.

As a general matter, *amicus* participation does not trigger collateral estoppel. *See United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991). Nevertheless, the Supreme Court has found that in some extraordinary cases a party may be barred by collateral estoppel for its earlier role as an *amicus curiae*. *See Montana v. United States*, 440 U.S. 147 (1979). In that case the government went beyond merely filing an *amicus* brief, but also "totally financed and controlled" the litigation. *United States v. Mendoza*, 464 U.S. 154, 159 n.5 (1984).[11]

---

[11]The Supreme Court in *Montana* noted that it was undisputed that the United States exercised control over the earlier litigation in which it had been an amicus. 440 U.S. at 155. In particular, the government had stipulated that it had:

(1) required the [earlier] lawsuit to be filed;
(2) reviewed and approved the complaint;
(3) paid the attorneys' fees and costs;
(4) directed the appeal from State District Court to the Montana Supreme Court;
(5) appeared and submitted a brief as amicus in the Montana Supreme Court;
(6) directed the filing of a notice of appeal to [the Supreme] Court; and
(7) effectuated [the named party's] abandonment of that appeal on advice of the Solicitor General.

*Id.*

Cinemark asserts that the government's actions in this case amount to the extraordinary circumstances discussed in *Montana*. Specifically, Cinemark asserts that the government went beyond the role of neutral friend of the court by asserting a new substantive claim, by introducing new evidence, by filing a second brief, by submitting responses in opposition to Cinemark's motions, and by taking part in oral arguments before both the district court and the Fifth Circuit.

The government, in response, contends that it did not assert a claim against Cinemark, nor did its attaching a report to its *amicus* brief constitute the submission of new evidence. It further argues that in its opposition to Cinemark's motion to compel discovery from the DOJ, it emphasized that its role as a non-party and as *amicus* was limited to providing the court with the Department of Justice's interpretation of its own regulations. Finally, the government notes that it opposed Cinemark's motion for a scheduling order amendment that would have permitted Cinemark to seek to add the DOJ as a party.

Although the government's actions in *Lara* might have been more than that of a typical *amicus curiae*, they are still a far cry from having "totally financed and controlled" the litigation. *Mendoza*, 464 U.S. at 159 n.5. The government was therefore not collaterally estopped in this case.

*D. Summary Judgment for Cinemark's Theaters that are Within the Fifth Circuit*

Finally, Cinemark argues that the government's assertion of claims with a national scope ignores that *Lara* is controlling authority in the Fifth Circuit and that the government cannot ask the Sixth Circuit to overturn precedent as applied to theaters within the Fifth Circuit's jurisdiction. Cinemark therefore urges this court to affirm the district court's decision granting summary judgment as to all of Cinemark's stadium-style theaters that are within the jurisdiction of the Fifth Circuit.

This pertains to the scope of relief, and therefore is a matter for the district court to decide consistent with the principles of comity. The government has stated in its brief that it will not make any demands with regard to Cinemark's theaters that are within the Fifth Circuit until such time as the law might change within that circuit. Therefore, we need not address this issue at the present time.

## CONCLUSION

Because the district court erred in holding that ADAAG § 4.33.3 requires only that theaters provide disabled patrons with unobstructed views of the screen and failed to give meaning to the word "comparable" in ADAAG § 4.33.3, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.