# United States Court of Appeals

## For the First Circuit

Nos. 03-1646, 03-1787, 03-1808

UNITED STATES OF AMERICA,

Plaintiff, Appellee/Cross-Appellant,

v.

HOYTS CINEMAS CORPORATION; NATIONAL AMUSEMENTS, INC.,

Defendants, Appellants/Cross-Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before
Boudin, Chief Judge,
Torruella and Selya, Circuit Judges.

James R. Carroll with whom David S. Clancy, Christopher S. Fortier and Skadden, Arps, Slate, Meagher & Flom LLP were on brief for National Amusements, Inc.
Michael J. Malone with whom Patricia A. Griffin, Leslie J. Arnold and King & Spalding LLP were on brief for Hoyts Cinemas Corporation.
David K. Monroe, Steven John Fellman, and Galland, Kharasch, Greenberg, Fellman & Swirsky, P.C. on brief for National Association of Theatre Owners, Inc., Amicus Curiae.
Gregory B. Friel, Department of Justice, Civil Rights Division, Appellate Section, with whom R. Alexander Acosta, Assistant Attorney General, Michael J. Sullivan, United States Attorney, Michael J. Pineault, Assistant United States Attorney, and Jessica Dunsay Silver, Department of Justice, Civil Rights Division, Appellate Section, were on brief for the United States.

August 20, 2004

**BOUDIN, <u>Chief Judge</u>.**  This case comes to us on appeal from summary judgment, in an enforcement action brought by the United States under Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12181-12189 (2000), granting relief against two movie-theater companies.  At issue is the placement of wheelchair spaces in their "stadium-style" movie theaters.  Similar cases have divided the circuits on the interpretation and application of a longstanding regulation designed to implement the ADA's accessibility requirements for movie theaters, concert halls, and like venues.

The ADA was enacted to remove barriers to equal participation by the disabled in community life.  <u>See</u> 42 U.S.C. § 12101.  The statute contains provisions, both general and specific, that apply to the design and construction of movie theaters and other facilities of public accommodation. Relying heavily upon the concept of "discrimination," the statute aims to assure a substantial measure of equality and integration for the disabled who use such facilities.[1]  The provisions describing the overall

_____

[1]Section 302(a) of the ADA, 42 U.S.C. § 12182(a), prohibits discrimination against disabled persons in "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  Section 302(b)(1) mandates that the disabled not be denied "the opportunity . . . to participate in or benefit from" goods, services, facilities, privileges, advantages, and accommodations, <u>id.</u> § 12182(b)(1)(A)(i), or be afforded a benefit "not equal to that afforded other individuals," <u>id.</u> § 12182(b)(1)(A)(ii); that such benefits not be "different or separate from" those provided to other individuals (unless equality

"prohibition of discrimination" are cast in quite general terms (e.g., "full and equal enjoyment," "most integrated setting appropriate to the needs of the individual"). Id. § 12182(a)-(b). Other provisions, also generally phrased, govern new construction and alteration.[2]

To provide guidance for those who must comply, Congress created a multi-layered scheme. An existing government entity--the Architectural and Transportation Barriers Compliance Board, widely referred to as the "Access Board"--was directed to create new minimum guidelines (supplementing pre-ADA accessibility guidelines) within nine months of the ADA's enactment. 42 U.S.C. § 12204. The Access Board has representatives from numerous government agencies, including the Justice Department, and presumably has much experience with architectural issues. 29 U.S.C. § 792 (2000).

The statute further required the Attorney General within one year to promulgate regulations of his own consistent with the

---

so requires), id. § 12182(b)(1)(A)(iii); and that benefits be provided "in the most integrated setting appropriate to the needs of the individual," id. § 12182(b)(1)(B).

[2]Governing "new construction" is section 303(a)(1), in which Congress defined unlawful discrimination to include "a failure to design and construct facilities for first occupancy [after January 26, 1993], that are readily accessible to and usable by individuals with disabilities," unless "structurally impracticable." 42 U.S.C. § 12183(a)(1). A sister provision describes parallel accessibility obligations accompanying voluntary alterations to existing facilities, to the "maximum extent feasible," in the altered areas. Id. § 12183(a)(2).

-3-

minimum guidelines issued by the Access Board. 42 U.S.C. §
12186(b)-(c). The Justice Department was also directed to provide
technical assistance to the public in coordination with the Access
Board, including in the form of technical assistance manuals. Id.
§ 12206(a)-(c). After overlapping notice-and-comment periods, the
Access Board adopted the required minimum guidelines and, on the
same day, the Justice Department adopted them as ADA regulations
without change.[3]

One of the regulations--which is the focus of this case--
is known as standard 4.33.3 and prescribes the placement of
wheelchair spaces in newly constructed "assembly areas" set for
first occupancy after January 26, 1993, and for alterations
occurring after January 26, 1992. 28 C.F.R. §§ 36.401-.402, 36.406
(2003). The language most pertinent to this case reads as follows:

> Wheelchair areas shall be an integral part of
> any fixed seating plan and shall be provided
> so as to provide people with physical
> disabilities a choice of admission prices and
> lines of sight comparable to those for members
> of the general public.

Id. pt. 36 app. A § 4.33.3. Further language requires a companion
fixed seat next to each wheelchair seating area and provides that,

---

[3]United States v. Nat'l Amusements, Inc., 180 F. Supp. 2d 251,
255 & n.4 (D. Mass. 2001). The pertinent final rules are:
Americans with Disabilities Act (ADA) Accessibility Guidelines for
Buildings and Facilities, 56 Fed. Reg. 35,408 (July 26, 1991); and
Nondiscrimination on the Basis of Disability by Public
Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,544
(July 26, 1991).

where total seating capacity in the facility "exceeds 300, wheelchair spaces shall be provided in more than one location." Id. The standard contains no definition of "lines of sight," "integral" or any other term of art.

In 1991, when the regulations including standard 4.33.3 were adopted, most movie theaters were of a traditional type in which all seats are located on a single flat or sloped floor. In or around 1995, the new "stadium" movie theater concept was developed. Typically, a few rows of traditional seating on a flat or sloped floor were retained at the front of the auditorium, and behind them rose the majority of the seats on tiers of stepped risers--as in many sports stadiums. Somewhat confusingly, the term "stadium" is also often used to refer just to the section of the seating area on risers (at least, where the risers create a steep enough incline), as opposed to the more gently sloped seating area in front, which we will call for simplicity's sake "the slope."

Between 1996 and 2000, the defendants in this case--two big theater chains called Hoyts and National--constructed large numbers of stadium theaters, including the 500 or so at issue in this case, ranging in size from fewer than 100 seats to more than 600 seats. Most are roughly in the 150-350 seat range; of the 225 Hoyts theaters at issue, 41 have 300 seats or more, and of the 284 National theaters, 52 have 300 seats or more. These theaters are of many different designs, and the accommodations for wheelchairs

-5-

vary; but in a great many of them the wheelchair positions are clustered (together with an ordinary companion seat for each wheelchair space) in the sloped section of the theater.

In smaller theaters with 300 seats or fewer, wheelchair spaces are typically in the sloped section, although in a few cases the spaces are at the back of the theater or (depending on how one labels spaces in an access aisle separating the slope from the stadium) arguably in the first row of the stadium section. In larger theaters with more than 300 seats, for which standard 4.33.3 requires more than one location, wheelchair spaces are dispersed accordingly, usually with some at the rear of the auditorium. Wheelchair placement decisions appear not to be irreversible; in some theaters, wheelchair spaces were initially placed in the front row, but later moved further back.

During the period from 1996 to 2000, as stadium-style theaters grew in number, the Justice Department made no changes to standard 4.33.3, although in July 1998 the Department filed an amicus brief in a private ADA enforcement action brought in district court against an individual theater complex. Lara v. Cinemark USA, Inc., No. EP-97-CA-502-H, 1998 WL 1048497, at *1 (W.D. Tex. Aug. 21, 1998). There, the Department asserted that unobstructed lines of sight from wheelchair spaces were not enough; rather, the Department urged that under the ADA and standard 4.33.3, the quality of sight lines--as measured primarily by

horizontal and vertical angles from the viewer to the screen--had to be comparable with those enjoyed by many or most non-wheelchair patrons.

On appeal the Fifth Circuit flatly rejected the Department's position, holding that the existing regulations required only unobstructed lines of sight, Lara v. Cinemark USA, Inc., 207 F.3d 783, 789 (5th Cir.), cert. denied, 531 U.S. 944 (2000). Further litigation followed in other circuits. Two of them--the Sixth and Ninth--ruled that viewing angles were a component of "comparable lines of sight" and that wheelchair-using patrons could not as a group be subject to highly uncomfortable viewing angles while superior angles were provided for other patrons.[4]

In each of these cases, the Department appears to have asserted that the "integral part" phrase in standard 4.33.3 requires wheelchair spaces to be located in the stadium section of stadium theaters, regardless of the size of the theater and the adequacy of viewing angles provided from the slope. However, an Access Board technical manual issued in July 1998 said that

---

[4]United States v. Cinemark USA, Inc., 348 F.3d 569, 579 (6th Cir. 2003), cert. denied, 124 S. Ct. 2905 (2004); Oregon Paralyzed Veterans of Am. v. Regal Cinemas, Inc., 339 F.3d 1126, 1133 (9th Cir. 2003), cert. denied, 124 S. Ct. 2903 (2004). The Second Circuit remanded for further development in a third case when the Department filed an amicus brief on appeal. Meineker v. Hoyts Cinemas Corp., 69 Fed. Appx. 19, 23-26 (2d Cir. 2003) (unpublished order).

wheelchair spaces had to be within the "footprint of the seating layout" and that "bleachers with notches or cut-out areas" would qualify as integrated. Access Board, ADAAG Manual 117 (1998). The circuit cases, concerned primarily with viewing angles, have not clearly addressed the extent to which integration is required.

On December 18, 2000, the Justice Department brought the present enforcement action under the ADA, filing lawsuits (later consolidated) against Hoyts and National, in the district court in Massachusetts. The complaints charged that a number of theaters controlled by these companies were in violation of the ADA and standard 4.33.3. They sought declaratory and injunctive relief-- including retrofitting existing theaters--as well as damages and civil penalties. Ultimately, the government contended that each company had more than two hundred non-complying theaters.

Discovery ensued, including reports by and depositions of experts on both sides. The district court refused to allow full-scale discovery of Justice Department files by which the defendants sought to show that the Department had been divided in its view of standard 4.33.3 or even had once embraced the defendants' interpretation. However, the district court did dismiss one count of the complaints, to the extent that it relied on statutory duties beyond those imposed by standard 4.33.3; the court viewed the regulation as establishing the defendants' present obligations

under Title III as to wheelchair placement.  <u>Nat'l Amusements</u>, 180 F. Supp. 2d at 256-62.[5]

Eventually the defendants moved for summary judgment; the Department opposed the motion without asking for summary judgment in its favor.  The defendants argued that the Fifth Circuit's <u>Lara</u> decision was correct, and that their obligation under standard 4.33.3 was to provide unobstructed lines of sight, which they had done.  The district court held an oral hearing on September 12, 2002, at which it described its own tentative views and invited further submissions to supplement the record.

On March 31, 2003, the court issued an extensive decision, denying the defendants' motion for summary judgment but granting <u>sua sponte</u> summary judgment for the Department to the extent of providing declaratory but not injunctive relief.  <u>United States</u> v. <u>Hoyts Cinemas Corp.</u>, 256 F. Supp. 2d 73, 91, 93 (D. Mass. 2003).  The court then entered judgment to this effect and closed the case on its docket.  Both sides treat this as a final judgment

---

[5]Count I of the Department's complaints alleged violations of standard 4.33.3, characterizing these violations as unlawful discrimination under the ADA's root antidiscrimination provision, section 302(a), 42 U.S.C. § 12182(a), and under section 303(a)'s specific requirement that "new construction and alterations" be "readily accessible to and usable by" individuals with disabilities, 42 U.S.C. § 12183(a)(1).  Count II incorporated the same violations of standard 4.33.3 into a more general claim of discrimination under section 302(a) and under section 302(b)'s mandate of equality and integration in public accommodations, 42 U.S.C. § 12182(b).

and, noting the district court's docket entry and the lack of any commitment to further proceedings, so do we.

The district court's declaration, embodied in the judgment, says that standard 4.33.3--seemingly in all cases and regardless of stadium size--requires placing wheelchair spaces in the stadium section of the theater. Hoyts Cinemas, 256 F. Supp. 2d at 93. However, as a matter of due process and in light of the lack of clarity in standard 4.33.3, the district court ruled that this obligation would only be applied to those of the defendants' theaters "wherein construction or refurbishment . . . occurs on or after the date on which this lawsuit commenced," that is, December 18, 2000. Id. From this judgment, both sides have appealed.

The defendants' appeals primarily contest the district court's reading of standard 4.33.3 and the decision to make the ruling retroactive to the start of this case, but the defendants also offer procedural and discovery objections. The government primarily defends the district court's substantive ruling, although saying that the court went too far in seeming to condemn wheelchair spaces that provide "comparable" viewing and are on risers--but on risers shorter than the court's understanding of "stadium" would imply. The government's main claim of error on its cross-appeal is that greater retroactivity should have been afforded to the district court ruling.

In our court, briefing followed and oral argument was held February 6, 2004. However, at that time a petition for certiorari was pending in the Supreme Court seeking review of the Ninth Circuit's decision in Regal Cinemas based on the conflict with Lara, so we withheld decision. But the Solicitor General later opposed certiorari, noting that a new Access Board amendment would soon provide further guidance. Virtually at the end of its Term, the Court denied review. Regal Cinemas, Inc. v. Stewmon, 124 S. Ct. 2903 (2004).

The Access Board amendment, just adopted in July 2004,[6] requires that in assembly areas of more than 300 seats, wheelchair spaces shall be dispersed and shall provide wheelchair users a choice "of seating locations and viewing angles that are substantially equivalent to, or better than," those "available to all other spectators." Americans with Disabilities Act (ADA) Accessibility Guidelines for Buildings and Facilities ("Amended ADAAG"), 69 Fed. Reg. 44,084, 44,198 (July 23, 2004) (to be codified at 36 C.F.R. pt. 1191 app. B § 221). In smaller theaters, no "vertical dispersal" would be required if the wheelchair spaces provided "viewing angles that are equivalent to, or better than,

_____

[6]The Department has announced its intention to conduct a rulemaking to revise its Title III regulations, including adopting the amended Access Board guidelines, starting in January 2005. Unified Agenda, 69 Fed. Reg. 37,749, 37,749 (June 28, 2004).

-11-

the average viewing angle provided in the facility." Id. at 44,199.

On these appeals, we address in order three principal issues: first, whether section 4.33.3 supports either the defendants' claim that their obligations are limited to unobstructed lines of sight or the Department's claim that wheelchair locations must always be in the stadium section of every theater; second, whether the district court correctly ruled that wheelchair placement in the stadium section is automatically required for all stadium theaters based on the alleged factual superiority of such seating; and third, whether the district court's retroactivity ruling is correct. Other issues are presented but are most easily addressed within this framework.

Standard 4.33.3. The defendants appear to have built many, perhaps most or all, of the stadium theaters in question on the premise that their central obligation was to provide wheelchair spaces with unobstructed lines of sight, anywhere within the plan of each theater. Usually they found it most convenient to place the wheelchair spaces in the sloped section (sometimes though not always near the front), but other times wheelchair spaces were placed in the front row or so of the stadium section or at the very back. In considering the defendants' defense of this approach, the initial question is the substantive legal standard against which to measure it.

Here, the government's complaint challenged the defendants' seating arrangements in two counts, one resting upon a regulation--standard 4.33.3--and the regulation's statutory bases, and the other resting mainly upon a set of more general statutory provisions bearing upon accommodations.  The district court dismissed the second count to the extent that it sought to impose obligations beyond the more specific standard, Nat'l Amusements, 180 F. Supp. 2d at 256-262, and the government has not taken direct issue with this approach.

We accept this premise because neither side disputes it and because it makes more sense to focus upon a somewhat uncertain regulation directed to the very problem at hand rather than an even vaguer set of statutory provisions framed in more general terms.  Nevertheless, the statute as a whole remains highly relevant.  It provides the purpose and general objectives that cast light on the meaning of the regulation at issue.  See Navarro v. Pfizer Corp., 261 F.3d 90, 102 (1st Cir. 2001).

Turning to standard 4.33.3, we note at the outset that it has two pertinent elements--one directed to "comparability" of lines of sight and the other to assuring that wheelchair spaces are made an "integral" part of the theater seating plan.  These two elements correspond to two themes that run through Title III of the ADA.  Title III's main thrust is to secure access for the disabled, but many of the provisions are aimed at assuring not only

-13-

reasonable access but reasonable equality of access so far as feasible, while other provisions are concerned with the related but distinct aim of preventing undue segregation of the disabled. See note 1, above.

The defendants' theaters at issue in this case do provide wheelchair access: there are locations provided for wheelchairs, feasible means of reaching them, and (apparently) unobstructed lines of sight. The defendants say that this is all that the regulation requires and that standard 4.33.3 does not dictate that angles of sight for those seated in wheelchairs be as good as those for non-wheelchair patrons seated higher up in the theaters. And, say the defendants, quality of viewing aside, the regulation certainly does not say that there is a mechanical obligation to place wheelchair spaces in the stadium section of the theater.

We start with the issue of angles of sight. Admittedly, the defendants' position has been adopted by one circuit (in Lara), seconded by a strong dissent in the Ninth Circuit's Regal Cinemas decision. 339 F.3d at 1135-37 (Kleinfeld, J., dissenting). It gains some force from the broader context: the regulations were intended to provide guidance and it would have been child's play for the drafters to make clear that the "lines of sight" requirement encompassed not only unobstructed views--a classic problem for wheelchair occupants in many types of auditoriums and arenas (especially where spectators tend to stand)--but also angles

-14-

of sight.  Yet the Department and the Access Board apparently took no such position until 1998.

While all of this is relevant to the equities that inform a decision on retroactive relief, we think that the better reading of the regulation is that it takes angles of sight into account. Admittedly, the drafters may not have thought about angles at all; there is no clear "legislative history."  But judges constantly read statutes and regulations in light of language, purpose, and other policy considerations to solve problems that the drafters may not have squarely considered.  See Versyss, Inc. v. Coopers & Lybrand, 982 F.2d 653, 654-57 (1st Cir. 1992), cert. denied, 508 U.S. 974 (1993).  On balance, the considerations favor the government.

Words are the usual starting point in interpretation. "Lines of sight" is a fairly general phrase, no doubt capable of being used to refer only to an unobstructed view; but its very generality makes it capable of encompassing comparability of angles as well as freedom from obstruction.  Each side can muster dictionary glosses but it is enough here that those favoring the government are at least as good as those favoring the defendants. Then, the balance is easily tipped by the underlying policy of the statute.

The ADA places substantial emphasis on equality of access.  See, e.g., 42 U.S.C. §§ 12101(a)(5), 12182(a).  As a

-15-

matter of common sense, this cannot be absolute equality; a tilt-back chair for ordinary patrons does not therefore entail a tilt-back platform for a wheelchair. But at least in some theater layouts, the evidence indicates that lines of sight for close-up wheelchair patrons could be quite uncomfortable and distorting. See Regal Cinemas, 339 F.3d at 1128. If most or all of the wheelchair sites in the theater have badly degraded views and most or all of the non-wheelchair seats have good viewing angles, the basic objective of the statute would surely be undermined.

Extreme angles in either the vertical (up-down) or horizontal (right-left) planes have a double disadvantage--physical discomfort, especially if the head has to be tilted back too far, and visual distortion. True, some patrons have unusual preferences and some seats are always going to be worse than others; but even before the ADA the evidence shows an understanding in the theater design business that extreme angles are inferior. The government's and the theaters' evidence may suggest that vertical angles exceeding 35 degrees to the top of the screen (or 30 degrees to the center) are less than comfortable; but whatever the "right" numbers, the record shows that severe angles at some stage grow markedly less satisfactory to many patrons.

In sum, the statutory objective can best be carried out by applying standard 4.33.3's comparability requirement to angles of sight as well as lack of obstruction. Whether the standard was

initially clear enough to justify this interpretation to theaters constructed before the district court's decision is a separate issue to which we will return. Just what "comparability" may require is also a different question; it is harder to provide guidance on this issue because of the variety of approaches available, the fact-intensive character of the issue, and the lack of adequate briefing.

In reaching our conclusion, we give some weight to the Justice Department's interpretation of the regulation. Such deference is proper even though the Department's gloss is offered only in a brief rather than in some more formal manner (e.g., an interpretive ruling), see Auer v. Robbins, 519 U.S. 452, 461-62 (1997), although the courts must then be alert to the risk of post hoc rationalizations. Id. at 462; see Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 213 (1988) (discounting "a convenient litigating position"). The Department's position on angles has been consistent since Lara. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 515 (1994).

Admittedly, standard 4.33.3 was drafted by the Access Board and adopted mechanically by the Department on the same day. But there remain institutional reasons for giving some weight to the Department's reading, Paralyzed Veterans of Am. v. D.C. Arena L.P., 117 F.3d 579, 585 (D.C. Cir. 1997), cert. denied, 523 U.S. 1003 (1998); cf. Navarro, 261 F.3d at 98-99, although one

conventional reason for deference--expertise--could well justify giving some weight to the views of the Board itself.  In any event the Board's 1998 technical manual agrees that "[b]oth the horizontal and vertical viewing angles must be considered in the design of assembly areas."  Access Board, supra, at 117.

Where our reading of standard 4.33.3 differs from that of the Department is on the second element--the "integral" requirement--which the government says requires that wheelchair spaces always be placed in the stadium section.  Here, two possible positions must be distinguished:  first, that standard 4.33.3 requires this result as a matter of law even if the quality of viewing from the slope is as good as that in the stadium section; or second, that as a factual matter placing wheelchair spaces in the stadium section is required in a particular theater whenever-- as the Department thinks is common--the view from the slope is worse than from the stadium.

At different times the government has taken each of these positions.[7]  The two arguments rest on different concepts and have different results, namely for theaters that offer slope seating

_____

[7]A number of passages in the government's initial district court filings seemingly take the per se legal position that "integral" means within the stadium section because that is the main or most popular section in stadium theaters.  At summary judgment, and in this court, the government's briefs are more guarded, shifting toward an argument that in fact stadium seating provides superior viewing and is preferred by most patrons--and therefore only seating there is "integral."

comparable in quality to seating in the stadium. No circuit court has adopted a reading of the word "integral" that automatically compels wheelchair siting in all stadium sections regardless of slope-seating quality. We reject such a reading of "integral" and now explain why, reserving for discussion later the Department's more modest factual argument that quality differences commonly justify wheelchair seating in the stadium area.

Integration is inherently a matter of degree--one could have a wheelchair space in every row of the theater--and the term "integral" does not tell one anything about how much integration is required. Read straightforwardly, "integral" means that the wheelchair locations must be a constituent part of the theater, see Random House Dictionary of the English Language 990 (2d ed. 1987). The Access Board took just this view in its 1998 technical manual, saying that "integral" required wheelchair locations to come within "the footprint of the seating layout." Access Board, supra, at 117.

Further, the same technical manual deals directly with "dispersal." Pertinently, it says that in theaters of over 300, wheelchair spaces must be provided "in all areas, including sky boxes and specialty areas." Access Board, supra, at 117. The converse implication is that in smaller theaters there is no automatic requirement that wheelchair spaces be in any specific location. Of course, in a particular theater (perhaps in most),

-19-

"comparability" might require stadium locations for wheelchairs--but this is a different issue, dependent upon evidence.[8]

Angles of sight were a familiar aspect of theater design when the standard was framed, and there is nothing implausible about reading "lines of sight" to encompass the angles at which the lines connect the viewer to the screen. But the term "integral" was adopted in standard 4.33.3 before there were stadium theaters. To read it as mechanically requiring wheelchair spaces in a particular part of the theater, regardless of the adequacy of the view from the slope, appears to us not to gloss the word but to re-write the regulation in a fashion that could not reasonably be anticipated.

Deference to the agency's view does not mean abdication. Here, the Department's gloss (unlike that in the Access Board's 1998 manual) is an unnatural reading of "integral," advanced inconstantly in this very case, and peculiarly rigid and specific as applied to a class of theaters not conceived of until well after the standard was written and adopted. The Department is free to interpret reasonably an existing regulation without formally amending it; but where, as here, the interpretation has the practical effect of altering the regulation, a formal amendment--

_____

[8]The amended version of standard 4.33.3 just adopted by the Access Board similarly distinguishes between large and small theaters, requiring dispersal only in the former but requiring adequate viewing angles in theaters of all sizes. Amended ADAAG, 69 Fed. Reg. at 44,198-99.

almost certainly prospective and after notice and comment--is the proper course.[9]

The District Court's Main Ruling. The district court, confronted with the defendants' motion for summary judgment, instead granted summary judgment for the government. Its holding, and main rationale for that holding, can be summed up in the district court's own language:

> [S]tadium-style theaters cannot possibly offer "lines of sight comparable to those for members of the general public" when wheelchair-accessible seats are placed only in the traditional-seating section, whether on risers or otherwise.

Hoyts Cinemas, 256 F. Supp. 2d at 88 (quoting 28 C.F.R. pt. 36 app. A § 4.33.3). The court also said that such seating could not be "integral," but this ruling rested expressly on the same premise, namely, "the superiority of the stadium section." Id. at 89.

The district court's bases for this factual conclusion appear to be three: the district judge's taking of judicial notice that movie patrons prefer the middle or back of the theater; several assertions by the district judge as to why stadium seating is superior; and what the district judge called "a matter of simple

---

[9] See Shalala v. Guernsey Memorial Hosp., 514 U.S. 87, 100 (1997) (stating that APA rulemaking would be required if a new agency position "effec[ted] a substantive change in the regulations" (internal quotation marks omitted)); Mission Group Kan., Inc. v. Riley, 146 F.3d 775, 782 (10th Cir. 1998) (distinguishing agency interpretations that are "new" rules, which would require APA notice and comment, from those that really are "interpretation[s]" of existing rules (emphases omitted)).

-21-

geometry," namely, that theater seats in the stadium section, which is further back than the slope, offer patrons narrower and flatter sight lines. Hoyts Cinemas, 256 F. Supp. 2d at 88.

On appeal, the defendants lodge an initial procedural objection, pointing out that there was no cross-motion for summary judgment by the government. There is nothing impermissible in considering a grant of summary judgment sua sponte, but it is then ordinarily vital for the court to give the parties notice. Without such notice, the opponent of such a disposition may be deprived of the chance to muster affidavits and other evidence to show that a genuine issue of material fact precludes summary judgment. See Rogan v. Menino, 175 F.3d 75, 80-81 (1st Cir.), cert. denied, 528 U.S. 1062 (1999); Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 31 (1st Cir. 1996).

In the oral argument on the defendants' motion, the district court did give the parties some notice of its tentative thinking, and the court also gave the parties opportunity to make further written submissions, in particular inviting them to reconsider the "integral" problem. Indeed, on appeal the defendants rely on evidence already in the record as precluding summary judgment; whether with better notice they would have offered even more evidence is unclear.

We need not resolve the procedural objection. On the present record we conclude that the district court has not

justified a finding that condemns each and every theater that provides slope but not stadium spaces for wheelchairs. A trial, or perhaps even summary judgment backed by more evidence and further analysis, might justify such a result for many of the theaters-- perhaps most or even all. But the district court's blanket determination--that all slope-only wheelchair placement is inferior, whatever the size or configuration of the theater--is multiply flawed.

We begin with the district judge's reliance on judicial notice to establish the preferences of movie theater patrons. Deciding whether facts are "adjudicative," and so subject to stringent substantive and procedural requirements, Fed. R. Evid. 201, is often no easy task as one moves further back on the spectrum from the "what happened here" kinds of issues. See United States v. Bello, 194 F.3d 18, 22-23 (1st Cir. 1999); Fed. R. Evid. 201(a) advisory committee's note. But the seating preferences of patrons in stadium theaters are a central issue in this case; the district court deemed it adjudicative by relying on Rule 201, and the government does not argue otherwise.

One of the requirements of Rule 201 is procedural, namely, that the parties be given notice and an opportunity to object to the taking of judicial notice. See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269, 273 (1st Cir. 1993), cert. denied, 514 U.S. 1082 (1995). The district judge

did refer in the hearing to his own experience in a particular stadium theater, but this is less than a clear-cut warning that judicial notice will be used to convert this single instance into a universal proposition that may not be disputed.  In any event the rule also requires both that the noticed fact be "not subject to reasonable dispute" and that it be so either (1) on the basis of general knowledge within the territorial jurisdiction of the trial court or (2) because it is capable of being determined by an assuredly accurate source.

To support the district court's judgment, the preference for middle to rear seating must be not just common but ubiquitous, applying to every stadium-style movie theater regardless of size or configuration.  The district court's decree applies to all of the defendants' many theaters where wheelchair spaces are not in the stadium section--several hundred in number, designed by different architects, and scattered across the United States.  Possibly, most of the audience in every single theater at issue prefers stadium seating, but this cannot a priori be beyond reasonable dispute.

Nor does Rule 201's source requirement appear met.  It may be common knowledge in Boston that seating at a particular theater is best in the middle or back, although this would be much more plausible in a small, one-theater town; but surely residents of Boston have no such common knowledge about particular theaters in other states.  Nor does the district court point to an

-24-

unquestionably accurate source--a respectable almanac is the usual example--to support its proposition.  As we will see, the district court's proposition is colorably disputed, as to some theaters, by defense evidence in this very case.

Rule 201 is applied with some stringency, because accepting disputed factual propositions about a case "not tested in the crucible of trial is a sharp departure from standard practice." Lussier v. Runyon, 50 F.3d 1103, 1114 (1st Cir.), cert. denied 516 U.S. 815 (1995); cf. New Alliance Party v. N.Y. State Bd. of Elections, 861 F. Supp. 282, 292 (S.D.N.Y. 1994) ("[Ballot] position bias may be a commonly-held belief in this jurisdiction, but its imprecise and conditional nature preclude it from being characterized as a judicially noticed fact . . . .").  Here, theater seating preferences were a matter for evidence, not judicial notice.

The district court's second basis for its finding of stadium-seating superiority was a set of general observations about the qualities of stadium seating.  Specifically, the court said that stadium seating (being further back) has less risk of image distortion and excessively wide horizontal or uncomfortable vertical angles of sight, and also that the stadium seats are larger, more comfortable, better elevated over seats in front and endowed with wider arm rests (with cup holders) and tilt-back ability.  No source is given for these propositions beyond the

statement that they are gleaned "from the record of undisputed facts." Hoyts Cinemas, 256 F. Supp. 2d at 78-79.

It is not clear why the quality of the theater seats themselves matters since wheelchair patrons apparently use spaces for their chairs rather than theater seats. But the angle and distortion considerations are plausible reasons why many (perhaps most) patrons, in many (perhaps most) theaters, might prefer seating in the stadium section. Yet it is hardly obvious that this would be true in every stadium theater regardless of configuration.

Further, the question on summary judgment is not whether the district court's assumptions might prove right but whether the government's affidavits and other evidence are so overwhelming that there is no basis for a trial and specific factual findings. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56; cf. Fed. R. Civ. P. 52(a). Here, the defendants did point to evidence that viewers in particular theaters found some seats in the slope or in the access aisle equally attractive to some seats in the stadium, and that in others wheelchair spaces in the slope

had quite good angles.[10]  The district court's decision does not discuss such evidence.

The district court's last building block is its geometry argument, which is easily enough grasped:  moving back from an object narrows both the horizontal and vertical angles of sight from observer to the perimeter lines of the object.  Indeed, if the screen is itself placed high up from the floor, stadium seats may already be closer to eye level with the screen.  There is nothing wrong in using such indisputable premises for reasoning about the facts.  Cf. United States v. Amado-Nunez, 357 F.3d 119, 121-22 (1st Cir.), cert. denied, 124 S. Ct. 2864 (2004).

But distance has disadvantages of its own; the object is further away, details smaller, and the experience perhaps less absorbing for many viewers.  Further, narrower angles are surely better, in any meaningful sense, only up to a point.  Both sides, for example, point to evidence suggesting a comfort range in the vertical plane of 30-35 degrees or less; where such views are provided on the slope, this could arguably provide comfort

---

[10]Using an audit of actual seating choices in over 100 Hoyts and National theaters, orchestrated by a Justice Department expert (under supervision from Hoyts and National employees), Hoyts identifies two of its theaters in which the rows where the wheelchair spaces were placed (in the middle access aisle) are among the most popular rows.  National mentions 20 theaters that satisfy the demanding viewing comfort test advanced by a Justice Department expert in this case.

"comparable" to stadium seats even if the latter had even flatter angles.

On appeal, the government makes no effort to sustain the district court judgment by arguing that its evidence shows, so overwhelmingly as to justify summary judgment, that in every theater the quality of viewing is better from the stadium section. What its brief says about the evidence is that "[a] substantial number of defendants' auditoriums situate the wheelchair areas in locations that afford lines of sight that are inferior to those provided most other members of the general public." The district court's judgment was not limited to "a substantial number" of theaters.

Admittedly, the government's examples and data are telling. It says that about 150 of the theaters in dispute have wheelchair viewing angles that range from 36 to 55 degrees, while most of the non-wheelchair seats have "more comfortable viewing angles." It also offers some specific examples of theaters with inferior wheelchair placement, providing information about those specific viewing angles. And its brief points to complaints by wheelchair patrons as well as survey data showing that in one theater complex, among others identified in the record, nearly all patrons preferred stadium to slope seating.

So the government might well have a case on summary judgment for a ruling that some, many, or even most, of the

defendants' theaters violate the comparability requirements of standard 4.33.3. But on this appeal it does not ask us to affirm the district court's judgment as to any _individual_ theater. Nor is this court the proper place in the first instance to sort through the evidence and decide, theater by theater, whether a particular theater should be condemned on summary judgment. Cf. Fed. R. Civ. P. 52(a) & advisory committee's note (1985 amendment). Nor can this be done until the parties abandon the all-or-nothing approach and deal directly with individual theaters or groups of theaters.

The government apparently did provide in the district court an expert report in which most of the theaters were condemned based on a fairly abstruse multi-part test. But by summary judgment the government had disavowed relying on the report's conclusions, and the report was severely criticized by the district court, which found it "confusing, overlong, and, just as the Cinemas contend, 'absurdly demanding.'" Hoyts Cinemas, 256 F. Supp. 2d at 87 n.12. There may be other material in the record that would assist a summary judgment motion condemning all theaters based on lack of comparability, but it is not identified in the government's brief on appeal.

Whether a remand will entail trench warfare litigation on a theater-by-theater basis or whether there are shortcuts remains to be seen. It is not hard to imagine developing criteria as to comparability that could be applied somewhat mechanically to the

angles in individual theaters. But whether summary judgment by the government could ever be supported as to some theaters or even all is a matter to be addressed on remand if the government makes such a motion.

Retroactivity. After declaring that all stadium theaters must include wheelchair spaces in the stadium section, the district court said that this ruling would apply to theaters built or refurbished on and after the date of the filing of the government's complaint (December 18, 2000). The defendants say that the proper starting date is the date of the district court's own decision. The government, by cross-appeal, says that the ruling should apply to all of the theaters at issue, whenever built (all were built after 1993).

Technically, we could refuse to comment on this issue because the district court's merits decision is being vacated. Indeed, the equities as to retroactivity depend on the shape of the final substantive order, and the substantive order that results from our remand is not likely to be exactly the same as the present order. Nevertheless, it may facilitate the remand, and enhance the possibility of settlement, for us to address the retroactivity issue in general terms.

The power of a district court to craft and even withhold injunctions based on equitable considerations is well established. Equitable relief is ordinarily discretionary, Dudley v. Hannaford

Bros. Co., 333 F.3d 299, 311 (1st Cir. 2003), and the ADA confirms that court enforcement invokes the court's discretionary judgment. 42 U.S.C. § 12188(b)(2); see also 28 C.F.R. § 36.504. "Discretion," of course, implies latitude for the district judge, but subject always to the overriding constraint that the discretion be reasonably exercised. U.S. Pub. Interest Research Group v. Atlantic Salmon of Me., LLC, 339 F.3d 23, 32 (1st Cir. 2003); Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, 321 n.6 (1st Cir. 1989) (en banc).

In this instance, the district court began its discussion of retroactivity by saying that it agreed with the defendants "that due process requires that the Court's declaration ought operate only prospectively." Hoyts Cinemas, 256 F. Supp. 2d at 91. Due process may furnish a floor to protection, based primarily on lack of fair warning,[11] but we think that equitable principles give the district court even greater latitude to decline or limit retroactivity. For example, the court might equitably consider not only the level of warning but also government indolence or misleading advice and the avoidance of extravagant expenditure for

---

[11]In Cheshire Hosp. v. N.H.-Vt. Hospitalization Serv., Inc., 689 F.2d 1112, 1121 & n.10 (1st Cir. 1982), we explained that "the retroactive application of a new interpretation of an old regulation," like a new regulation itself, is subject to due process analysis; and "a critical consideration is the extent to which a retroactive rule or interpretation adversely affects the reasonable expectations of concerned parties."

little gain.  Cf. United States v. Mass. Water Res. Auth., 256 F.3d 36, 45-46, 55-58 (1st Cir. 2001).

There is no doubt that standard 4.33.3 is vague as to whether it embraces angles, that the Justice Department has been slow in providing more precise guidance by regulation, and that the belated amicus brief in Lara and the differing conclusions of the courts have impaired predictability.  And some range of expenditures for altering existing theaters to achieve theoretical perfection might not be reasonable; this the government more or less concedes in its briefs.

Nor is it a conclusive answer to argue, as the government does from public sources, that the theater industry has long regarded viewing angles as important in designing theaters and that this was certainly true in 1991 when standard 4.33.3 was framed. Whether or not viewing angles mattered to patrons, the defendants were entitled to provide the minimum that the law required of them. Thus, from a narrow standpoint, the defendants might be able to say that they lacked clear warning of the government's gloss until 1998.

On the other hand, anyone who read the ADA's own broader language and took account of the underlying policy might well have understood that imposing truly bad viewing angles on wheelchair patrons--say, angles of the kind described in the Ninth Circuit's Regal Cinemas decision--would not be a whole-hearted implementation

of the statute and that the phrase "lines of sight" could be read to cover more than an unobstructed view. Theater chains can afford able counsel.

The extent to which "retroactive" application seems unfair may depend in part on exactly what obligation is ultimately imposed on the defendants. Merely as an example, putting wheelchair spaces in the stadium section of every already constructed theater is one thing; remedying terrible wheelchair viewing angles in the worst existing theaters is something else. In a court of equity it is legally possible, and almost surely wise in this case, to decouple what is required prospectively from what is required as to theaters already built.

Against this background, we note three concerns as to the district court's approach. First, if one looks for an authoritative government statement of its general position, Lara supplied that in 1998; if the test is a definitive judicial determination for these defendants, this came only with the district court's own decision. Why the filing of this lawsuit makes sense as an equitable date for implementing a decision made several years later is not obvious and not explained.

Next, the court gave no explicit consideration to the possibility that some of the defendants' theaters are so inhospitable to wheelchair patrons that a measure of reconstruction is warranted--although surely not everything that would be required

of a new theater.  Admittedly, an all-or-nothing solution as to retroactivity has advantages of its own and, if the district court opted against any reconstruction, this might be within its reasonable discretion.  But the issue is worth addressing.

Equitable considerations do not operate only one way. The plight of the disabled, whom Congress sought to protect starting over a decade ago, is the central concern of the statute and a proper consideration--even in a due process assessment. Even in a due process context, the public interest bears upon the retroactivity to be allowed.  "[N]ot every law that upsets expectations is invalid; courts have generally compared the public interest in the retroactive rule with the private interests that are overturned by it."  Adams Nursing Home of Williamstown, Inc. v. Mathews, 548 F.2d 1077, 1080 (1st Cir. 1977).

This brings us to a different issue.  The defendants complain that any limit on retroactivity is meaningless if the comparable viewing angles requirement is applied not only to new theaters built after its announcement but also (as the district court suggested) to any "refurbishment" of existing theaters; this is so, they say, because under the district court's definition of "refurbishment" as any change that requires a building permit under local law, even the minutest change (e.g., laying electrical lines) might entail the complete revamping of the entire theater.

Obviously this issue needs to be briefed and addressed as part of any decision as to retroactivity.

Such concerns underscore the need for the parties to have due notice and be given an opportunity to argue about retroactivity after the prospective obligations have been established. Yes, courts often address issues on which the parties may not earlier have focused fully; motions to reconsider exist partly for this reason. Given our remand on the merits, we need not resolve the theaters' claim that last time they had insufficient opportunity to address the retroactivity problems.

There remains the defendants' claim that the district court erred in denying them (provisionally) discovery of Justice Department internal communications on the meaning of standard 4.33.3. Our own interpretation set forth above, which would not be altered by internal Justice Department communications, moots the discovery so far as it aims to influence the interpretation of standard 4.33.3. If such discovery has any bearing on the equities that affect retroactivity, the defendants are free to refocus and renew their request on remand.

One other observation may be helpful. The Access Board's amended standard 4.33.3, if adopted by the Department, goes a long way to determining for the future the extremely difficult question of how much "comparability" is required for new construction. But it is an amendment, not a gloss on the existing regulation, and

-35-

therefore does not itself govern existing theaters (future alterations aside). If the parties can reach practical accommodations as to the worst of the existing theaters, the remand may prove a much simpler task than it initially might appear.

Although compelled to remand, we acknowledge the district court's thoughtful discussion in a case that is formidably difficult, due both to the complexity of the legal issues and to the number and variety of theaters in dispute. It is now time for the parties to show an equal dedication by attempting to work out a settlement, bearing in mind that no solution as to existing theaters will be perfect and that prompt improvements may matter more than theoretical perfection.

The judgment of the district court is <u>vacated</u> and the matter <u>remanded</u> for proceedings consistent with this decision. Each side shall bear its own costs on this appeal.

<u>It is so ordered.</u>